Opinion by Judge WALLACE; Dissent by Judge CLIFTON.
OPINION
WALLACE, Senior Circuit Judge:
Appellants Polimaster Ltd. and Na & Se Trading Company, Ltd. (Na & Se) (collectively, Polimaster) appeal from the district court’s confirmation of an arbitration award against them and in favor of appellee RAE Systems, Inc. (RAE). They also appeal from the district court’s subsequent order granting pre- and post-judgment interest on the arbitration award. We have jurisdiction pursuant to 28 U.S.C. § 1291 and 9 U.S.C. § 16(a)(1)(D), and we reverse and remand.
I.
Appellant Polimaster Ltd. is a limited liability company based in Belarus, engaged in the design and manufacture of radiation monitoring instruments. Appellant Na & Se is a corporation based in Cyprus, engaged in intellectual property licensing. In January 2003, Polimaster Ltd. and Na & Se entered into a contractual relationship with RAE, a Delaware corporation with its principal place of business in California. The parties signed two agreements, the “Nonexclusive License for Proprietary Information Usage” (License Agreement) and the “Product and Component Buy/Sell Agreement” (Buy/Sell Agreement), which provided for RAE’s manufacture and distribution of Polimaster-developed radiation detection devices.
The License Agreement refers to Na & Se as the “Licensor,” RAE as the “Licensee,” Na & Se and RAE as the “Parties,” and Polimaster Ltd. as the “Manufacturer.” The License Agreement contains a dispute resolution provision that states:
9.1 In case of the dispute between the Licensor and the Licensee on the issues provided for by the present Agreement the Parties shall take every effort for their settlement by negotiations.
9.2 In case of failure to settle the mentioned disputes by means of negotiations they should be settled by means of arbitration at the defendant’s side.
The parties agree that “defendant’s side” means “defendant’s site,” that is, the geographical location of the defendant’s principal place of business. The Buy/Sell Agreement also contains an arbitration clause, which states, “7.1 The Parties shall exert the best efforts to settle up any disputes by means of negotiations, and in case of failure to reach an agreement the disputes shall be settled by arbitration at the defendant’s site.”
Disputes arose in the course of performing the agreements. In May 2005, Polimaster filed an action against RAE in the United States District Court for the Northern District of California. After the district court denied Polimaster’s request for a preliminary injunction, the parties negotiated to submit Polimaster’s claims to arbitration in California (that is, defendant RAE’s “site,” as directed in the agreements). In May 2006, Polimaster and RAE commenced arbitration by a joint letter to “JAMS,” an arbitration provider *835 organization (since renamed “JAMS, The Resolution Experts”). Although the parties jointly submitted to arbitration, Polimaster made the following reservation:
It is Polimaster’s position that no counterclaims will be filed in this matter based on the requirement in the agreement that all such claims be filed in the location of the party against whom such claims are brought. Because Polimaster is located in Belarus, Polimaster asserts that all such claims against it shall be brought in that location.
In July 2006, Polimaster submitted its demand for arbitration, setting forth claims against RAE for breach of contract under both the License Agreement and the Buy/Sell Agreement, misappropriation of trade secrets, and unfair competition. In August 2006, RAE submitted its answer to Polimaster’s demand for arbitration, in which RAE set forth not only its affirmative defenses and responses to Polimaster’s allegations, but also RAE’s own claims against Polimaster, which it called “counterclaims.” RAE asserted several claims sounding in contract and tort, including interference with prospective economic advantage, fraud and negligent misrepresentation.
Polimaster asked the arbitrator to dismiss RAE’s “counterclaims,” arguing that any claims by RAE against Polimaster could not be arbitrated at RAE’s site in California, because the arbitration agreement required that they be brought at the “defendant’s [site],” that is, at Polimaster’s site. The arbitrator refused to dismiss RAE’s counterclaims, reasoning that the contract did not specify where counterclaims should be brought. To fill the perceived gap, he applied procedural rules regarding compulsory counterclaims, as defined in Federal Rules of Civil Procedure, California Rules of Civil Procedure, and JAMS rules. The arbitrator decided it would be contrary to “notions of fairness, judicial economy and efficiency” to “[p]rosecut[e] a claim with affirmative defenses in one venue while simultaneously prosecuting counterclaims almost identical to the affirmative defenses in another [venue].” Instead, he reasoned, RAE’s “counterclaims” should be “heard in the same venue as the properly situated original arbitration claims [by Polimaster against RAE].”
The arbitrator in California ultimately adjudicated both Polimaster’s claims and RAE’s “counterclaims.” The arbitrator issued an Interim Award in July 2007, which rejected all of Polimaster’s claims and awarded damages to RAE on its successful counterclaim, in the amount of $2,412,432. By a Final Arbitral Award dated September 20, 2007, the arbitrator confirmed the findings and conclusions of the Interim Award and further awarded costs to RAE, as the prevailing party, in the amount of $46,213.15.
Thereafter, RAE sought confirmation of the arbitration award in the United States District Court for the Northern District of California. Polimaster moved to vacate the award, arguing that the arbitral procedure was not in accordance with the parties’ agreement and that the arbitrator exceeded his powers by allowing RAE to assert “counterclaims” at RAE’s own site in California rather than at the “defendant’s [site]” as required by the agreement. The district court confirmed the award to RAE, and this appeal followed.
II.
The parties agree that the arbitration agreement and award are governed by the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the New York Convention), June 10, 1958, 21 U.S.T. 2517. We must confirm an arbitration award falling under the New York *836 Convention unless we determine that “one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the [sic] said Convention.” 9 U.S.C. § 207; see also Mgmt. & Technical Consultants S.A v. Parsons-Jurden Int’l Corp., 820 F.2d 1531 (9th Cir.1987) (Parsons-Jurden).
The New York Convention enumerates seven defenses to the recognition or enforcement of an arbitral award. These grounds include, among others, that the award “deals with a difference not contemplated by or not falling within the terms of the submission to arbitration,” that the parties were under some incapacity or their agreement is not valid under the law of the country where the award is made, or that the party against whom the award is invoked was not able to present its case. 21 U.S.T. 2517, Art. V, §§ l(a)-(c). In this appeal, Polimaster invokes the defense set forth in Article V, § 1(d), of the New York Convention:
(d) The composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties, or, failing such agreement, was not in accordance with the law of the country where the arbitration took place.
21 U.S.T. 2517, Art. Y, § 1(d). Polimaster asserts that the arbitration procedure was contrary to the parties’ agreement because the arbitrator allowed RAE to bring its claims, calling them “counterclaims,” against Polimaster in an arbitration proceeding in California, thereby permitting RAE to bring a claim at its own site.
We review de novo whether a party established a defense to enforcement of an arbitration award under the New York Convention. China Nat’l Metal Prods. Import/Export Co. v. Apex Digital, Inc., 379 F.3d 796, 799 (9th Cir.2004). As the party seeking to avoid enforcement of the award, Polimaster has the burden of showing the existence of a New York Convention defense. Ministry of Def. of the Islamic Republic of Iran v. Gould, Inc., 969 F.2d 764, 770 (9th Cir.1992). Polimaster’s burden is substantial because the public policy in favor of international arbitration is strong, id., and the New York Convention defenses are interpreted narrowly. See China Minmetals Materials Imp. & Exp. Co., Ltd. v. Chi Mei Corp., 334 F.3d 274, 282-83 (3d Cir.2003); Gould, 969 F.2d at 770 (adopting narrow interpretation of defense based on arbitrator exceeding authority); Parsons & Whittemore Overseas Co. v. Societe Generale de L'Industrie du Papier (RAKTA), 508 F.2d 969, 976 (2d Cir.1974) (adopting narrow interpretation of public policy defense).
The grounds for refusing confirmation of an award under the Federal Arbitration Act (FAA), 9 U.S.C. § 10, generally track those under the New York Convention, although they are not coextensive. See Parsons-Jurden, 820 F.2d at 1534. When interpreting the defenses to confirmation of an arbitration award under the New York Convention, we may look to authority under the FAA. Parsons & Whittemore, 508 F.2d at 974.
III.
We may decline enforcement of an arbitral award on the basis that “the arbitral procedure was not in accordance with the agreement of the parties.” 21 U.S.T. 2517, Art. V, § (l)(d). To determine whether the procedure used was contrary to the parties’ agreed arbitral procedures, we must begin with the language of the parties’ arbitration agreement. See Encyclopaedia Universalis S.A. v. Encyclopaedia Britannica, Inc., 403 F.3d 85, 91 (2d Cir.2005); Coast Trading Co. v. Pac. Molasses Co., 681 F.2d 1195, 1198 (9th Cir. *837 1982); cf. generally Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 84, 123 S.Ct. 588, 154 L.Ed.2d 491 (2002) (holding that, in the context of an arbitrability determination, the court reviews the contract de novo); Simula, Inc. v. Autoliv, Inc., 175 F.3d 716, 719 (9th Cir.1999) (also in context of arbitrability determination, the interpretation of the relevant contractual provision was subject to de novo review).
A.
In this case, the arbitration agreement provided that disputes “should be settled by means of arbitration at the defendant’s [site].” According to Polimaster, the arbitration agreement required RAE’s claims to be arbitrated in Belarus. According to RAE, the arbitration agreement was ambiguous concerning the treatment of counterclaims. Thus, according to RAE, the arbitrator correctly, and within the scope of his authority, resolved the ambiguity so as to allow litigation of RAE’s counterclaims at its own site in California.
For the reasons stated hereafter, we conclude that the arbitration agreement required that all requests for affirmative relief, whether styled as claims or counterclaims, be arbitrated at the defendant’s site. The arbitration agreement required that any “dispute” be arbitrated at “the defendant’s [site].” The term “dispute” encompasses both claims and counterclaims. Moreover, a party is a “defendant” as to any dispute where another party seeks damages or some other form of relief against him. Therefore, Polimaster was clearly the “defendant” as to RAE’s “counterclaims.” The “dispute” embodied in those claims should not have been arbitrated at RAE’s site in California.
1.
The arbitration agreement was not ambiguous. The agreement contemplated that all claims should be asserted at the defendant’s site. This provided a clear designation of the forum for arbitration. Cf., e.g., Bauhinia Corp. v. China Nat’l Mach. & Equip. Imp. & Exp. Corp., 819 F.2d 247, 249 (9th Cir.1987) (ambiguous forum selection provision). The requirement of arbitration at the defendant’s site is effectively a forum selection clause, in which the parties agreed to arbitrate at the location of a defendant’s principal place of business. This choice of forum is presumptively enforceable. See Scherk v. Alberto-Culver Co., 417 U.S. 506, 519, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974); M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 13-14, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972).
The dissent takes a different position: it asserts that the arbitration agreement is ambiguous. According to our dissenting colleague, “To the extent that any answer can be gleaned from the language used in the agreement, I think the language cuts slightly against the majority opinion’s interpretation.” The dissent points out that the arbitration clause in question provides that, in the event that “the mentioned disputes” cannot be settled by “negotiations[,] they should be settled by means of arbitration at the defendant’s [site].” Because the word “disputes” is plural, but the words “defendant” and “side [site]” are singular, the dissent reasons that “[t]he parties anticipated that there could be multiple disagreements, yet the ‘defendant’s site’ refers to only one location.”
The dissent’s construction of the arbitration clause, however, is simply not reasonable. The term “disputes” as used in section 9.2 of the Agreement refers back to the category of disputes made subject to the arbitration clause, as defined in section 9.1 of the Agreement. Section 9.1 provides that, in the case of “the dispute [sic] *838 between the Licensee and the Licensor on the issue provided for by the present Agreement” the parties were to make “every effort for their settlement by means of negotiations.” Section 9.2 contemplates that, in the event that “the mentioned disputes” cannot be settled by negotiations, they should be “settled by means of arbitration at the defendant’s [site].” Thus, the plural term “disputes,” as used in section 9.2 of the Agreement, is merely a reference back to the covered disputes set forth in section 9.1, i.e. disputes “on the issues provided for by the present Agreement.” When viewed in context, the plural term “disputes,” cannot reasonably be said to mean consolidation of multiple claims into a single arbitration because that would be contrary to the more specific forum-selection clause contained in section 9.2 of the Agreement.
2.
The arbitrator opined that the arbitration clause was indeterminate because it failed to provide expressly for the treatment of counterclaims. The dissent likewise concludes that the arbitration clause is faulty for failure to contemplate counterclaims. But that the agreement neither expressly included nor excluded counterclaims does not render it indeterminate. There is no reason why the arbitration agreement had to provide for the treatment of counterclaims. To conclude that the arbitration clause is ambiguous on this basis sets up a rigged game: criticizing the failure to provide for the treatment of counterclaims presumes that such a clause is a necessary, indispensable, or essential component of an agreement to arbitrate. But there is no reason that this must be so.
The dissent argues that, “it is not a novel or obscure practice to resolve all claims, including counterclaims, in a single proceeding that has already commenced.” The dissent, like the arbitrator below, also points to rules pertaining to counterclaims in the Federal Rules of Civil Procedure, the California Rules of Civil Procedure, and the rules of the arbitration forum agreed upon by the parties (JAMS). The dissent argues that the arbitration clause in this case is ambiguous because “[t]he prosecution of counterclaims in the same proceeding is broadly recognized in international arbitration.” The dissent then points to general procedural rules and guidelines from several international arbitration provider organizations that typically would apply to the extent those rules are consistent with a given agreement to arbitrate. See, e.g., International Chamber of Commerce (ICC) Rules of Arbitration art. 5; London Court of International Arbitration Rules art. 2.1(b); United Nations Commission on International Trade Law (UNCITRAL) Arbitration Rules art. 19.
Nevertheless, although the joinder of counterclaims into a pending proceeding is widely contemplated by various rules of procedure, the parties simply did not incorporate these rules into their contract. Instead, once the assumption that counterclaims will be joined into a pending proceeding is recognized as what it is— merely an assumption — it is clear that the parties’ clause was adequate to express their intent. To put the point differently, the parties’ clause was adequate to provide for separate arbitrations at the defendant’s site. See, e.g. Gary B. Born, International Commercial Arbitration in the United States 6 (1994). There is no reason to require the parties to include contractual language specifically defeating or negating the joinder of claims. The dissent’s viewpoint is, in effect, based on the dissent’s assumption that counterclaims should be joined in a pending proceeding. We believe it would be circular to interpret the *839 parties’ agreement therefore by reference to rules that the parties did not incorporate into their contract and which are inconsistent with the parties’ agreement to arbitrate. See, e.g., Emmanuel Gaillard & John Savage, Eds., Fouchard, Gaillard, Goldman on International Commercial Arbitration 632-53 (1999) (pointing out that the procedural rules of the forum need not apply to conduct of international arbitration).
Indeed, to the extent that we look to, or incorporate, our domestic rules of procedure in construing the arbitration clause at hand, we believe those rules tend to support our interpretation. Counterclaims are “affirmative claims for relief’ and are “offensive in nature.” Daniel R. Coquilette, et al., eds., Moore’s Federal Practice § 13.90[1] (3d Ed. 2010); see also FDIC v. F.S.S.S., 829 F.Supp. 317, 322 n. 11 (D .Alaska 1993) (“Counterclaims are separate claims independent of the plaintiffs underlying claim.”); In re Concept Clubs, Inc., 154 B.R. 581, 586 n. 4 (D.Utah 1993). Under Federal Rule of Civil Procedure 13, a party is the “defendant” against a counterclaim. See Moore’s Federal Practice § 13.90[2][a]; see also Rainbow Mgmt. Group v. Atlantis Submarines Haw., L.P., 158 F.R.D. 656, 659 (D.Haw.1994); Earle M. Jorgenson Co. v. T.I. U.S., Ltd., 133 F.R.D. 472, 475 (E.D.Pa.1991) (“Any party asserting a claim, whether an original claim, counterclaim, cross-claim or third-party claim, becomes an opposing party to the party sued” (internal citations and quotation marks omitted)).
The dissent points out that the term “defendant” could have a different meaning depending on the context. For instance, in litigation, “defendant” is sometimes used as a “shorthand” to “distinguish the original defending party from the party initially on the offensive.” See Moore’s Federal Practice at § 13.90[2]. The term, however, is used in the latter sense only when it is clear from the relevant context that the court, tribunal, arbitrator, or the parties have formally designated one particular side as the “defendant.” See id. In this case, the context and structure of the arbitration clause clearly indicate that the parties understood the “defendant” as a party against whom the other asserts a “dispute” arising out of the License Agreement or the Buy/Sell Agreement. Absolutely nothing in these agreements suggests that the parties understood the term “defendant” as a formal designation limited to the party initially on the defensive. It is well established that a counterclaim results in shifting the parties so that the party counterclaiming becomes the plaintiff on the counterclaim and the original plaintiff becomes the defendant. See Roberts Min. & Mill. v. Schrader, 95 F.2d 522, 524 (9th Cir.1938) (explaining that a “counterclaim [is], in effect, a new suit, in which Schrader was plaintiff and Smith was defendant”). Accordingly, there can be no dispute that Polimaster became the “defendant” as to RAE’s claims against it for affirmative relief, regardless of how RAE styled those claims. Under the clear language of the arbitration agreement, Polimaster was entitled to have the claims against it arbitrated in its home forum.
We acknowledge that the arbitration agreement in this case is an unusual one. The arbitration clause does not provide for a choice of law or a choice of procedural rules. See generally Born at 24 (describing the several choice of law issues present in international arbitrations); Alan Red-fern & Martin Hunter, Law and Practice of International Commercial Arbitration, 163-168 (2002). The arbitration clause also does not provide for the number of arbitrators or a method for their appoint *840 ment. Cf., e.g., ICC Standard Arbitration Clause, available at www.iccarbitration. org (last visited July 13, 2010) (recommending clause that states: “[a]ll disputes arising out of or in connection with the present contract shall be finally settled under the Rules of Arbitration of the [ICC] by one or more arbitrators appointed in accordance with the said Rules”); American Arbitration Association, Drafting Dispute Resolution Clauses: A Practical Guide at 4-5 (Sept. 1, 2007, available at www.adr.org, last visited July 13, 2010) (setting forth checklist of subjects generally appropriate for stipulation in arbitration clause); id. at 8-9 (providing several model arbitration clauses). In this case, the clause provides only for a choice of forum: defendants’ [Polimaster] site. That choice is entitled to enforcement.
B.
Admittedly, we have interpreted the parties’ arbitration clause so as to permit an inefficient result: parallel arbitrations in distant fora regarding similar and/or related topics and disputes. Indeed, the dissent accurately points out that requiring arbitration of a “counterclaim” in a separate proceeding at Polimaster’s site in Belarus “would represent an inefficient way to resolve disputes.” Over this point there is no dispute. But we do not agree with the implication that the dissent draws from the apparent inefficiency of the parties’ agreed procedures. The dissent argues that the arbitration clause should be construed in a manner to avoid inefficiency, because “[pjarties contractually adopting arbitration as the method for resolving disputes commonly do so to achieve efficiency.” The dissent further adds that “[i]t is logical to reason that the parties to this agreement did not intend an inefficient result.” Similarly, the arbitrator opined that parallel arbitrations in two fora “would appear to be inconsistent with the economic benefits of arbitration on which the parties relied in agreeing to arbitration.”
We disagree with the proposition that our interpretation of the arbitration clause should be controlled by efficiency concerns. There are two independent reasons why we cannot impose upon the arbitration clause an interpretation in the interests of confirming it to an imputed notion of efficiency. We now discuss those two reasons.
1.
First, the policy favoring arbitration “is at bottom a policy guaranteeing the enforcement of private contractual arrangements.” Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 625, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985). We must enforce the parties’ agreement according to its terms, even if the result is inefficient. See Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 217-21, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985) (arbitration required even when it results in inefficient procedures: “The legislative history of the Act establishes that the purpose behind its passage was to ensure judicial enforcement of privately made agreements to arbitrate. We therefore reject the suggestion that the overriding goal of the Arbitration Act was to promote the expeditious resolution of claims”). It is true that it may be inefficient to have multiple arbitrations regarding the parties’ dealings in different fora before different arbitrators. See China Nat’l, 379 F.3d at 802. But we cannot override the express terms of the parties’ agreement, because parties are free to agree to inefficient arbitration procedures. See Byrd, 470 U.S. at 221, 105 S.Ct. 1238 (“we rigorously enforce agreements to arbitrate, even if the result is ‘piecemeal’ litigation”); Moses H. Cone *841 Mem’l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 20, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983) (compelling arbitration where it would result in bifurcated proceedings). Thus, the “efficiency” position adopted by the arbitrator and the dissent is inconsistent with the true basis of the “federal policy favoring arbitration.”
In a similar vein, RAE asserts that we should “construe arbitral authority broadly to comport with the enforcement-facilitating thrust of the Convention and the policy favoring arbitration.” See Parsons-Jurden, 820 F.2d at 1534. While we recognize that the New York Convention was enacted to promote the enforceability of international arbitration agreements, that Convention, like the federal policy favoring arbitration more generally, favors enforcement of arbitration clauses according to the intent of the contracting parties. The New York Convention “recognizes the central role of the parties in fashioning the arbitration procedure, and provides sanctions for failure to adhere to the agreed procedures.” Born at 44; see also Rhone Mediterranee Compagnia Francese di Assicurazioni E Riassicurazoni v. Lauro, 712 F.2d 50, 54 (3d Cir.1983).
We cannot, therefore, “overlook agreed-upon arbitral procedures” in favor of the enforcement of an arbitration award. Encyclopaedia Universalis, 403 F.3d at 91. We also cannot utilize the federal policy favoring arbitration to justify the imposition of general procedural rules at the expense of the parties’ agreement. See Cargill Rice, Inc. v. Empresa Nicaraguense Dealimentos Basicos, 25 F.3d 223, 225-26 (4th Cir.1994); Szuts v. Dean Witter Reynolds, Inc., 931 F.2d 830, 831 (11th Cir.1991). Here, the parties expressly agreed to submit disputes to arbitration at “defendant’s[site].” The parties’ agreement effectively removed the decision regarding forum from the procedural decisions delegated to the arbitrator. The arbitrator could not override the parties’ express agreement in favor of general procedural rules. Indeed, adherence to the parties’ agreed-upon procedures is regularly enforced, such as where relevant to the choice of forum of arbitration, see Bear, Stearns & Co., Inc. v. Bennett, 938 F.2d 31, 32 (2d Cir.1991); National Iranian Oil Co. v. Ashland Oil, Inc., 817 F.2d 326, 332 (5th Cir.1987), or the appointment of arbitrators, see Universal Reinsurance Corp. v. Allstate Insurance Co., 16 F.3d 125, 128 (7th Cir.1993); Avis Rent A Car System, Inc. v. Garage Employees Union, 791 F.2d 22, 24 (2d Cir.1986).
2.
Second, the policy favoring arbitration “applies with special force in the field of international commerce.” Mitsubishi Motors, 473 U.S. at 631, 105 S.Ct. 3346. The Court has recognized the importance of forum-selection clauses to international trade: “agreeing in advance on a forum acceptable to both parties is an indispensable element in international trade, commerce, and contracting,” M/S Bremen, 407 U.S. at 13-14, 92 S.Ct. 1907, and that a choice of forum is “an almost indispensable precondition to achievement of the orderliness and predictability essential to any international business transaction,” Scherk, 417 U.S. at 516, 94 S.Ct. 2449.
There is no sound basis for imputing a concern for efficiency to the parties in this case. We cannot assume that the parties’ agreement to arbitrate was motivated by a desire for efficiency alone, or even that efficiency was a central motivation for their arbitration agreement. Indeed, there are many reasons why parties might agree to private dispute resolution; many of these reasons have nothing to do with efficiency. Non-efficiency justifications for arbitration are especially important in the *842 realm of international contracting. For example, international arbitration is often preferred as a method to obtain a neutral decision maker, and to “obviate[ ] the danger that a dispute under the agreement might be submitted to a forum hostile to the interests of one of the parties or unfamiliar with the problem area involved.” Scherk, 417 U.S. at 516, 94 S.Ct. 2449; see also Mitsubishi Motors, 473 U.S. at 631, 105 S.Ct. 3346; M/S Bremen, 407 U.S. at 13, 92 S.Ct. 1907; Born at 5. That appears to have been a critical concern to the contracting parties here: forum selection restricted to the defendants’ site. That language makes sense only by a joint view of the parties that neither will be required to defend itself except in a proceeding at its home forum.
In sum, although we recognize that parties often choose arbitration for sake of efficiency, we cannot impute such a motivation to the parties here, and we cannot and the arbitrator cannot rewrite the forum selection clause to suit a personal view of the virtue of efficiency.
C.
China National is not contrary to our holding in the present case. 379 F.3d 796. There, the arbitration provision at issue submitted disputes to arbitration by the China International Economic and Trade Arbitration Commission (CIETAC), pursuant to CIETAC arbitration rules, to be conducted in Beijing, Shenzhen, or Shanghai, as determined by the claimant. Apex commenced arbitration proceedings against China National in Shanghai. A few days later, China National commenced a separate arbitration in Beijing. Apex objected to China National’s arbitration application because it concerned the same purchase orders as its own arbitration application. CIETAC allowed the arbitrations to proceed separately, however. China National obtained a favorable award in the Beijing arbitration, and obtained confirmation of that award. Apex appealed, arguing that the arbitral procedure did not comply with the parties’ agreement.
We concluded that the maintenance of multiple arbitrations was not inconsistent with the arbitration agreement. The agreement specified three acceptable venues — Beijing, Shenzhen, or Shanghai — and made the selection the claimant’s option. “Nothing in the parties’ purchase orders either specifically designated Shanghai as the only appropriate arbitral forum or articulated a rule of decision for determining the appropriate forum.” Id. at 800. Further, the arbitration agreement incorporated CIETAC rules, “[t]hus, CIETAC did not trump specific terms of the parties’ purchase orders by turning to its own rules because the arbitral clause did not resolve the parties’ dispute itself.” Id. at 801.
China National thus involved an arbitration agreement dissimilar to what we consider here. In China National, the arbitration provision provided three options for forum to be selected by the claimant. This provision did not constitute a mandatory forum selection clause. Here, in contrast, there is no ambiguity in the agreement: it requires arbitration at the defendant’s site. Further, the parties in China National adopted CIETAC rules in their arbitration agreement; CIETAC did not trump the specific terms of the parties’ agreement. Cf. Cargill Rice, 25 F.3d at 225-26. Here, the parties made no similar choice of applicable procedures. Thus, the arbitrator’s reference to compulsory counterclaim procedures went outside of the parties’ agreement, and violated the specific agreement of the parties.
The dissent argues that our holding is inconsistent with China National. The dissent’s position is, at base, that “[t]he *843 parties’ disagreement in this case over who is a ‘defendant’ — a respondent to an initial claim only, or both an initial respondent and a party who responds to counterclaims — matches the China National debate over the meaning of the contractual word ‘claimant.’” The dissent reasons that “the arbitration clause here is equally ‘indeterminate’ with respect to the dispositive interpretive question of the precise meaning of ‘defendant.’ ”
In our view, however, the dissent focuses on an inapposite aspect of China National. Apex argued that CIETAC had disregarded the parties’ arbitration clause by permitting separate, parallel arbitrations to proceed. Apex, therefore, had to establish that the parties’ arbitration agreement permitted proceedings in only one forum “and not in multiple venues.” 379 F.3d at 799. As we have described, the agreement in China National gave the claimant the option to select one of three fora: Beijing, Shenzhen, or Shanghai. Because the arbitration agreement provided the choice of three fora at claimant’s option, “[njothing in the parties’ purchase orders either specifically designated Shanghai as the only appropriate arbitral forum or articulated a rule of decision for determining the appropriate forum. Apex [was] mistaken in its claim that the arbitration clause was sufficiently specific that CIETAC could determine the arbitral forum without reference to its arbitral rules.” Id. at 800. Further, we determined that the use of the term “claimant” did not limit arbitration proceedings to the first-chosen forum. Instead, “the clause does not define ‘Claimant’ but leaves it open as a variable term (i.e. either party could be a claimant).” Id. at 801. Thus, the term “claimant” did not designate the forum of arbitration in light of the fact that the clause allowed each “claimant” to elect the forum of arbitration. We stated that the arbitration clause — because it provided three potential fora for each claimant’s election — did not resolve the question of forum.
The dissent focuses on the insufficiency of the term “claimant” to resolve the dispute at issue in China National; but that term was insufficient to resolve the dispute in light of the contéxt of the arbitration agreement involved. Rather than being contradictory to our holding, we view China National’s discussion of “claimant” to be consistent with our conclusion. In China National, as in this case, two parties purported to be claimants. By extension, in this case, there are two claimants and two defendants. The arbitration clause at issue required arbitration at the “defendant’s [site].” In light of the mandatory forum selection clause, there is no ambiguity. This case is distinct from China National.
D.
We hold that Polimaster has established a defense under the New York Convention. Under the New York Convention, we may refuse enforcement of an award if it is the result of procedures that are contrary to the parties’ agreement. Here, the parties agreed to an arbitration clause that requires disputes to be arbitrated where the defendant is located; each party should be held to the contractual language requiring arbitration of disputes in the location of the party against whom relief is sought. The procedures used in the arbitration of “counterclaims” were “not in accordance with the agreement.” The district court erred in confirming the arbitration award for RAE.
IV.
On February 25, 2008, the district court issued an order confirming the arbitration award, but did not issue a judgment. Poli *844 master’s appeal of that order is discussed in Part III. On June 5, 2008, RAE filed a motion in our court, asking that, pursuant to Federal Rules of Civil Procedure 60(a), the district court be allowed to make corrections to the order. We denied that motion, but following a request from the district court for leave to fix “an omission and an error” in the February 25, 2008 Order, and a request from RAE that we reconsider our earlier denial of the Rule 60(a) motion, we granted RAE’s motion for reconsideration and “motion for limited remand” to allow RAE to file a Rule 60(a) motion in district court to correct the clerical errors identified by the district court. In the district court, RAE then filed its Rule 60(a) motion; on January 23, 2009, the district court granted the motion and filed an amended order and a judgment, this time including in its relief to RAE pre- and post-judgment interest. Polimaster now appeals from that judgment (case No. 09-15369), arguing that the judgment’s inclusion of pre- and post-judgment interest exceeded the scope of our limited mandate.
We need not reach the issue of whether the district court erred in this respect, because we hold that the district court’s judgment must be vacated for the reasons set forth in Part III of this opinion. We therefore remand for further proceedings consistent with this opinion.
REVERSED AND REMANDED.