**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| MICHAEL D. CASTRO, an individual, *Plaintiff-Appellant*, | No. 17-35703 |
| | D.C. No. 2:17-cv-00008-RSL |
| v. | |
| TRI MARINE FISH COMPANY LLC, an unknown entity; TRI MARINE MANAGEMENT COMPANY LLC, an unknown entity; CAPE MENDOCINO FISHING LP, an unknown entity; CAPE MENDOCINO FISHING LLC, an unknown entity; DOES, 1 through 20, inclusive, *Defendants-Appellees*. | ORDER AND AMENDED OPINION |

Appeal from the United States District Court
for the Western District of Washington
Robert S. Lasnik, Senior District Judge, Presiding

Argued and Submitted November 8, 2018
Seattle, Washington

Filed February 27, 2019
Amended April 15, 2019

Before:  M. Margaret McKeown and Michelle T. Friedland, Circuit Judges, and Susan R. Bolton,[*] District Judge.

Opinion by Judge McKeown

---

## SUMMARY[**]

### Arbitration

The panel reversed in part and vacated in part the district court's order treating an order issued by an arbitrator in the Philippines as a foreign arbitral award and confirming the arbitrator's order under the New York Convention and the Convention Act.

Looking to the essence of the arbitrator's order, the panel held that the order was not a foreign arbitral award because the parties had already agreed to settle their dispute, and so there was no outstanding dispute to arbitrate when they brought the matter to the arbitrator.  In addition, the purported arbitration did not follow the parties' prior agreements to arbitrate, nor did it follow Philippine arbitral procedure.

The panel remanded for the district court to assess jurisdiction under the Convention Act and—as

---

[*] The Honorable Susan R. Bolton, United States District Judge for the District of Arizona, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

appropriate—venue and any defenses to enforcement of the settlement.

## COUNSEL

William L. Banning (argued), Banning LLP, Rancho Santa Fe, California; John W. Merriam, Law Offices of John W. Merriam, Seattle, Washington; for Plaintiff-Appellant.

Colin J. Folawn (argued) and David Boyajian, Schwabe Williamson & Wyatt P.C., Seattle, Washington, for Defendants-Appellees.

Svetlana P. Spivak, Holmes Weddle & Barcott P.C., Seattle, Washington, for Amicus Curiae Joint Manning Group.

## ORDER

The opinion filed on February 27, 2019, and appearing at 916 F.3d 1191, is amended. On page 13, <flouted> is replaced with <appears to have omitted required aspects of>, and <deviated completely> is replaced with <appears to have deviated>. An amended opinion is filed concurrently with this order.

With these amendments, the panel has voted to deny the petition for panel rehearing.

The full court has been advised of the petition for rehearing and rehearing en banc and no judge has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35.

The petition for panel rehearing and rehearing en banc (Dkt. 36) is denied.  The motion to proceed as amicus (Dkt. 37) is granted.  No further petitions for en banc or panel rehearing shall be permitted.

## OPINION

McKEOWN, Circuit Judge:

Central to the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517 ("New York Convention"), and related federal law is the principle insulating foreign arbitral awards from second-guessing by courts.  But this appeal involves an even more fundamental question—whether we are presented with a foreign arbitral award at all.  In the mine run of cases, the answer is uncontroversial: when it looks, swims, and quacks like an arbitral award, it typically is.  Yet, in this unusual appeal, we have an arbitral award in name only.  There was no dispute to arbitrate, as the parties had fully settled their claims before approaching an arbitrator; the purported arbitration consisted of an impromptu meeting in a building lobby; and the "proceedings" disregarded the terms of three arbitration agreements between the parties and the issuing forum's arbitral rules.  We conclude that the resulting order is not an arbitral award entitled to enforcement under the Convention.

### BACKGROUND

In late 2012, Michael Castro moved from the Philippines, where he retains citizenship, to American Samoa to live with April Castillo, his fiancé, and her family.  Several months later, Castro was working in a Tri Marine

warehouse when Tri Marine offered him a crew position aboard the *F/V Captain Vincent Gann* (the "Vessel"), a fishing vessel with an imminent departure date.[1]  He accepted a position as a deck hand.

The day before departing, Castro visited Tri Marine's offices to sign employment paperwork.  Castro and Tri Marine dispute what was signed that day.  Tri Marine contends that Castro signed his employment agreement, which is consistent with the date typed on the agreement itself.  Castro insists that before departing he signed only "a half sheet of paper with a few sentences on it including [a] pay rate of $3.00 per ton [of fish caught], the name of the Vessel[,] and a signature line," and that he did not sign the employment agreement until he appeared before an arbitrator in February 2014.  The employment agreement— whenever Castro signed it—contained a mandatory arbitration provision applicable to all disputes or claims arising out of Castro's employment aboard the Vessel.  It required arbitration to occur in and subject to the procedural rules of American Samoa.

On July 30, 2013, approximately two weeks into the fishing trip, Castro fell down a set of stairs and severely injured his knee.  Castro requested that Tri Marine return him to American Samoa so he could travel to Hawaii for medical care, but Tri Marine instead arranged for Castro's transport to and medical care in the Philippines.  In mid-August, Castro underwent surgery for a torn anterior cruciate ligament and a torn meniscus, followed by treatment and

---

[1] Castro sued several entities with alleged interests in the Vessel. For purposes of this appeal, there is no relevant distinction between the entities.  We refer to them collectively as Tri Marine.

physical therapy.    Tri Marine paid Castro's medical expenses and monthly maintenance.

Several months into Castro's rehabilitation, doctors diagnosed his father with kidney cancer and predicted he would die without surgery.  Castro and his family could not afford his father's surgery, so Castro approached Rhodylyn De Torres, a Tri Marine agent in the Philippines, and negotiated a settlement of his disability claims.  In exchange for an advance of $5,000, Castro reiterated his assent to the employment agreement's arbitration and choice of law clauses.  Shortly after, Castro agreed in principle to release fully his claims in exchange for an additional $16,160.[2]

After Tri Marine prepared the settlement paperwork, Castro met De Torres at her office in Manila to finalize the settlement.  Castro speaks only rudimentary English—his native tongue is Tagalog—so Castillo, who has a greater proficiency in English, attended the meeting and helped him review the settlement materials.  De Torres informed Castro in advance that he would be signing release documents to conclude his case, but not that he would be participating in an arbitration.

De Torres and Castro provide divergent accounts of the meeting.  De Torres attests that over the course of two hours, she explained the documents to Castro in "Filipino language" (presumably, Tagalog), Castro indicated that he understood, and Castro signed the release documents.  She also indicates that she explained, and Castro agreed, that an

---

[2] We use variants of the terms "agree" and "settle" for convenience's sake.  We do not suggest any conclusion regarding Castro's defenses to formation and enforcement of the purported settlement.  Those defenses remain open issues on remand.

arbitrator would review and approve the release documents "to make the settlement legal and binding." Castro disputes whether De Torres translated documents into Tagalog, explained that he would be foregoing future legal claims by signing them, or informed him that he would be participating in arbitration. According to Castro, De Torres told him they would go to a different office merely to pick up the settlement check and execute paperwork acknowledging receipt.

Although it is disputed when in the day this happened, Castro executed a release of Tri Marine "from any and all liability or claims . . . arising out of or in any way connected with an illness, incident, and/or incidents aboard the [Vessel] on or about 30 July, 2013." Castro acknowledged and released his right to future maintenance and cure in exchange for the settlement amount. Like Castro's employment agreement (and as he reiterated when accepting his advance payment), the release provided that disputes over its validity and enforceability would be arbitrated in American Samoa.

After the parties had agreed to the terms of the release, a Tri Marine agent ushered Castro and Castillo to an office building that housed the National Conciliation and Mediation Board. De Torres had led Castro to believe that they would merely pick up the settlement disbursement and acknowledge receipt. Tri Marine now contends that they went to the Board's office to submit their dispute to arbitration. Gregorio Biares, an accredited maritime voluntary arbitrator, met the parties in the lobby and introduced himself as a neutral arbitrator.

The meeting was Castro's first and only interaction with an arbitrator. Seated at a small table in the public lobby, surrounded by strangers entering and leaving the building, Biares reviewed the settlement paperwork with Castro.

Biares attests that he explained the implications of the release and confirmed in Tagalog that Castro understood the documents. Castro paints a different picture: Biares "hurriedly flipped through the pages showing [Castro] where to sign," emphasized that the settlement was favorable to Castro, and misled Castro by characterizing the settlement as "just a first payment" and informing Castro that he is ineligible for protection under the Jones Act.

Although there was no arbitral case filed, Tri Marine provided Biares a "joint motion to dismiss" pursuant to the parties' settlement, accompanied by the release paperwork that Castro had already signed. The two-page joint motion to dismiss was the first "filing" in the "case," which lacks a case number. Biares signed a one-page document, labeled an "order," which recognized the settlement, stated that Biares found the settlement "not contrary to law, morals, good customs and public policy," and dismissed the "case" with prejudice. The order acknowledges that it is the product of a "Walk In Settlement" and that the release had already been "duly signed by both parties" before meeting with Biares.

Later treatment revealed that Castro's initial surgery had failed to graft his anterior cruciate ligament or address his torn meniscus. Facing additional surgery to repair these mistakes, Castro sued Tri Marine in Washington state court to recover the additional expenses. Invoking the New York Convention, Tri Marine removed the case to federal court and moved to confirm the order as a foreign arbitral award. The district court denied Castro's motion to remand, confirmed the order, and dismissed the case.

## ANALYSIS

## I. The New York Convention

The New York Convention, to which the United States is a party, governs "the recognition and enforcement of *arbitral awards* made in the territory of" a foreign state. New York Convention, art. I(1) (emphasis added). Through the Convention and implementing legislation, the United States sought "to encourage the recognition and enforcement of commercial arbitration agreements in international contracts and to unify the standards by which agreements to arbitrate are observed and arbitral awards are enforced in the signatory countries." *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 520 n.15 (1974).

The United States codified its Convention obligations in the Convention Act, 9 U.S.C. §§ 201–08. *Rogers v. Royal Caribbean Cruise Line*, 547 F.3d 1148, 1152–53 (9th Cir. 2008). Just as the Federal Arbitration Act ("FAA") affords considerable deference to domestic arbitral awards, the Convention Act does the same for foreign arbitral awards. *Polimaster Ltd. v. RAE Sys., Inc.*, 623 F.3d 832, 836 (9th Cir. 2010). A court must confirm a foreign arbitral award unless the party resisting enforcement meets its "substantial" burden of proving one of seven narrowly interpreted defenses. *Id.*; *see* 9 U.S.C. § 207 (incorporating the Convention's defenses); New York Convention, art. V (listing defenses). The judicial role in this process is circumscribed: "Confirmation under the Convention is a summary proceeding in nature, which is not intended to involve complex factual determinations, other than a determination of the limited statutory conditions for confirmation or grounds for refusal to confirm." *Zeiler v. Deitsch*, 500 F.3d 157, 169 (2d Cir. 2007).

Yet, before we employ the Convention's and the Convention Act's substantial protections, the threshold step is, of course, to ensure they apply. This interpretive inquiry requires our de novo review. *CVS Health Corp. v. Vividus, LLC*, 878 F.3d 703, 706 (9th Cir. 2017) (statutes); *Hosaka v. United Airlines, Inc.*, 305 F.3d 989, 993 (9th Cir. 2002) (treaties). The key question here is whether there is an "arbitral award" to consider. Amazingly, that term is not defined in the Convention Act, which governs only "arbitral award[s] falling under the Convention." 9 U.S.C. § 207. Congress defined "falling under the Convention," *id.* § 202, but not "arbitral award" or "arbitration." "Arbitration" and "arbitral award" are also undefined in the Convention itself and in the FAA, 9 U.S.C. §§ 1–16. *See Polimaster*, 623 F.3d at 836 ("When interpreting the defenses to confirmation of an arbitration award under the New York Convention, we may look to authority under the FAA.").

We therefore interpret the term by applying its common meaning and common sense. *Green Tree Fin. Corp.–Ala. v. Randolph*, 531 U.S. 79, 86 (2000). We also look to the American Law Institute's recent restatement on international commercial arbitration, which offers helpful guidance and background. *See* Restatement (Third) U.S. Law of Int'l Commercial Arbitration § 1-1 (Am. Law Inst., Tentative Draft No. 2, 2012) ("Restatement TD No. 2").[3] It sets forth several helpful definitions:

---

[3] Although the membership has not formally approved the full Restatement (Third) of the U.S. Law of International Commercial Arbitration, the American Law Institute has approved Tentative Draft No. 2, which contains the only sections that we consider here. *See Discussion of Restatement of the Law Third, The U.S. Law of International Commercial Arbitration*, 2012 A.L.I. Proceedings 143 (Am. Law Inst., May 22, 2012).

> An "arbitral award" is a decision in writing by an arbitral tribunal that sets forth the final and binding determination on the merits of a claim, defense, or issue, regardless of whether that decision resolves the entire controversy before the tribunal. . . .

> An "arbitral tribunal" is a body consisting of one or more persons designated directly or indirectly by the parties to an arbitration agreement and empowered by them to adjudicate a dispute that has arisen between or among them.

> "Arbitration" is a dispute resolution method in which the disputing parties empower an arbitral tribunal to decide a dispute in a final and binding manner.

*Id.* § 1-1(a)–(c).

## II. The Purported Arbitral Award

In a superficial sense, the order issued here resembles an arbitral award:  it was issued by an arbitrator and purports to award Castro a monetary remedy and dismiss the "case" with prejudice.   But labels and appearances are not controlling—we evaluate an award by looking to its essence. *Id.* § 1-1 cmt. a.  Several unique aspects of these proceedings lead us to conclude that the order is not an arbitral award within the meaning of the Convention.

To begin, there was no outstanding dispute to arbitrate by the time Castro and Tri Marine sat down with the arbitrator.  *Id.* § 1-1(c) ("'Arbitration' is a dispute resolution

method . . . ."). Integral to the Convention's conception of arbitration is the endeavor to resolve a dispute:

> [T]he tribunal must be dealing with a genuine disagreement to have jurisdiction. Where parties appoint an arbitral tribunal after a settlement to merely record the settlement in the . . . award, there is no "difference" between the parties to resolve; the parties have already settled the dispute. A "difference" is a necessary precondition of an "award" in the sense of the New York Convention.

Yaraslau Kryvoi & Dmitry Davydenko, *Consent Awards in International Arbitration: From Settlement to Enforcement*, 40 Brook. J. Int'l L. 827, 854 (2015); *see also Arbitration*, Black's Law Dictionary (10th ed. 2014) ("A dispute-resolution process in which . . . neutral third parties . . . resolv[e] the dispute."); A Decree Instituting a Labor Code Thereby Revising and Consolidating Labor and Social Laws to Afford Protection to Labor, Promote Employment and Human Resources Development and Insure Industrial Peace Based on Social Justice, Pres. Dec. No. 442 (as amended), art. 262 (1974) (Philippine Labor Code permitting arbitrators to "hear and decide . . . labor disputes"); Revised Procedural Guidelines in the Conduct of Voluntary Arbitration Proceedings, National Conciliation and Mediation Board, Rule II § 1(d) (2005) ("Procedural Guidelines") (Philippine rules of voluntary arbitration defining "Voluntary Arbitration" as a "mode of settling labor-management disputes").

Castro and Tri Marine agreed to settle their dispute, and to terms for doing so, before they ever visited an arbitrator.

In exchange for a monetary settlement, Castro released Tri Marine "from any and all liability or claims . . . arising out of or in any way connected with" the July 30, 2013 incident. Having settled their dispute, Castro and Tri Marine had nothing to arbitrate. *See* Restatement TD No. 2 § 1-1(c); Kryvoi & Davydenko, 40 Brook. J. Int'l L. at 854.

What's more, the purported arbitration in no way followed the parties' prior agreements to arbitrate. Because "[a]rbitration is consent-based," Restatement TD No. 2 § 1-1 Reporters' Note d, the tribunal "derives its jurisdiction and remedial powers" from the parties' assent, *id.* § 1-1 cmt. b. The employment agreement provided for arbitration in and subject to the procedural rules of American Samoa, the advance payment receipt reiterated the employment agreement's arbitration and choice of law clauses, and even the executed release provided for arbitration in American Samoa. The lobby meeting with Biares was a far cry—in venue and law—from the agreed procedure.

To be sure, parties can waive contractual terms, but Castro's conduct hardly demonstrates an intent to arbitrate his dispute in the Philippines. Castro had no dispute. He simply sought to pick up the settlement check and acknowledge receipt—which Tri Marine led him to believe he was doing. The setting and surroundings of the lobby sit-down suggested a coffee date more than an arbitral proceeding; little wonder, then, that Castro professed ignorance that the meeting supposedly constituted arbitration. These circumstances scarcely demonstrate that Castro sought to waive or amend his thrice-written agreement to arbitrate disputes in American Samoa. Nor do any of the final documents reference waiver of the parties' repeated commitments to arbitrate in American Samoa.

Beyond fidelity to the terms of the arbitration agreement, an "arbitrator[] . . . act[s] pursuant to the arbitration law of the arbitral seat . . . and any procedural rules that the parties may have adopted." Restatement TD No. 2 § 1-1 cmt. c. The parties did not "adopt" any procedural rules apart from those set forth in the three written agreements. The meeting also appears to have omitted required aspects of Philippine arbitral procedure. In the Philippines, voluntary arbitration begins upon receipt of a submission agreement signed by both parties. Procedural Guidelines, Rule IV § 4. No submission agreement was filed here. The submission agreement must list the specific issues to be arbitrated. *Id.*, Rule IV § 5. But no arbitrable issues existed here, as the parties had already resolved their dispute. Other Philippine pre-arbitration procedures, such as an initial conference, joint formulation of ground rules, and pleadings, were conspicuously absent as well. *Id.*, Rule VI §§ 2, 3, 6, 8. In sum, the procedure here appears to have deviated from typical Philippine procedures. This divergence confirms our understanding that arbitration did not occur.

We conclude that the parties' free-floating settlement agreement and order did not transform into an arbitral award simply because the parties convened with an arbitrator. Tri Marine may seek to enforce the release as a matter of contract, but the order approving the settlement is not an arbitral award under the Convention.

Importantly, our decision does not encroach on the common practice of reducing settlements reached *during* arbitration into arbitral awards, frequently termed "consent awards." Many international arbitral rules empower arbitrators—upon the parties' request—to enter consent awards. *See* Margaret L. Moses, *The Principles and Practice of International Commercial Arbitration* 205 (3d

ed. 2017). Consent awards encourage settlement by conferring substantial benefits—including the Convention's protections—upon parties that obtain them. *See* Nigel Blackaby et al., *Redfern and Hunter on International Arbitration* §§ 9.33, 9.34, 9.36 (Student ed. 2009) (noting that several international arbitral bodies embrace consent awards).

Our decision does not disturb this practice for a simple reason: it did not occur here. "Timing is important for a settlement agreement to become an award. Usually a consent award becomes possible after a tribunal has been constituted. . . . Otherwise the tribunal will have no right to render a consent award." Kryvoi & Davydenko, 40 Brook. J. Int'l L. at 842–43.[4] Philippine, American, and broadly applicable international rules impose this temporal limitation on consent awards. Philippine arbitrators may issue a consent award "[i]n the event that the parties finally settle their dispute *during the pendency of the arbitration proceedings*." Procedural Guidelines, Rule VII § 4 (emphasis added). Leading American and international arbitration groups espouse the same limitation. *See* Am. Arbitration Ass'n, *Commercial Arbitration Rules and Mediation Procedures* R-48(a) (2013); United Nations Commission on International Trade Law, *Model Law on International Commercial Arbitration*, art. 30(1) (2006). Even the two cases involving consent awards cited favorably by Tri Marine are consistent with this timing requirement. *See United States v. Sperry Corp.*, 493 U.S. 52, 56–57 (1989) (parties initiated arbitration, then settled, and then obtained a consent award); *Transocean Offshore Gulf of Guinea VII*

---

[4] The authors characterize their article as "the first major study of the legal regime governing consent awards in international arbitration." Kryvoi & Davydenko, 40 Brook. J. Int'l L. at 828.

*Ltd. v. Erin Energy Corp.*, No. CV H-17-2623, 2018 WL 1251924, at \*1 (S.D. Tex. Mar. 12, 2018) (same). The timing here was backwards—Castro and Tri Marine settled and then sought to arbitrate. The result is not a consent award.

Finally, we emphasize that our decision does not elevate form over function. Tri Marine protests, for instance, that to obtain a proper consent award, it could have simply initiated arbitral proceedings before finalizing the settlement. Perhaps, but not for nothing. An essential aspect of arbitration is each party's inability to unilaterally withdraw from proceedings. Restatement TD No. 2 § 1-1 cmt. c. Other, "[c]ollaborative forms of [alternative dispute resolution]," by contrast, "require the parties' continuing willingness to participate." *Id.* § 1-1 Reporters' Note c. Accordingly, "the weight of decisional authority and international consensus" does not treat collaborative processes, such as mediation, as "arbitration" under the Convention. *Id.* Had the arbitrator here balked—for instance, by ordering a hearing on voluntariness or enforcing the venue provision pointing to American Samoa—Tri Marine could have taken its settlement and gone home. Although perhaps a modest hurdle, the modicum of formality required for a proceeding to constitute arbitration is no empty ritual.

## III.    Remand

Because the district court treated the order as a foreign arbitral award, it proceeded in summary fashion under the Convention. For example, it weighed evidence and resolved genuine disputes of material fact in favor of Tri Marine, thereby rejecting out of hand Castro's coercion defense. In light of our conclusion, the district court's approach was in error. We vacate in full the order confirming the arbitral

award, including the ruling on the validity of the seaman's release.

At oral argument, Castro suggested for the first time that the absence of an arbitral award calls into question federal jurisdiction. The Convention Act permits removal of cases that "relate[] to an arbitration agreement or award falling under the Convention." 9 U.S.C. § 205. Although the order here is not an arbitral award, the subject matter of the case may nonetheless "relate[] to an arbitration agreement." *Id.*; *see Infuturia Glob. Ltd. v. Sequus Pharm., Inc.*, 631 F.3d 1133, 1138 (9th Cir. 2011) ("The phrase 'relates to' is plainly broad . . . .").

In light of the parties' failure to brief this issue on appeal, we take no position on the ultimate disposition of this jurisdictional question. We remand for the district court to assess jurisdiction and—as appropriate—venue and any defenses to enforcement.

## CONCLUSION

We review foreign arbitral awards deferentially, but we do not blind ourselves to reality when presented with an order purporting to be one. To cloak its free-floating settlement agreement in the New York Convention's favorable enforcement regime, Tri Marine asked an arbitrator to wave his wand and transform the settlement into an arbitral award. That is not sufficient to produce an award subject to the Convention.

**REVERSED IN PART, VACATED IN PART, AND REMANDED.**

Tri Marine shall bear costs on appeal.