A–1 A–LECTRICIAN, INC.; H.Q. Incorporated, dba Aloha Products; GP Roadway Solutions, Inc. (formerly Sun Industries, Inc.); Hawaiian Island Tire Co., Inc., dba American Tire Company; Island Lighting Co., Inc.; Jack Endo Electric, Inc.; Mark Luria; Mega Construction, Inc.; Mutual Plumbing Supply Co., Inc.; Pacific Jobbers Warehouse, Inc.; Royal Contracting Co., Ltd.; The Solaray Corporation (formerly Inter–Island Solar Supply); Triton Marine Construction Corp.; United Truck Rentals and Equipment Leasing, Inc.; Walker–Moody Construction Co., Ltd.; and Ralph S. Inouye Co., Ltd., Movants,

v.

COMMONWEALTH REIT; Select Income Reit; Masters Properties LLC; Robin 1 Properties LLC; TSM Properties LLC; and Sir Reit, Respondents.

Civ.No. 12–00607 ACK–BMK.

United States District Court, D. Hawai'i.

April 26, 2013.

Order Amending June 27, 2013.

Corey Y.S. Park, Law Offices Of Corey Y.S. Park, LLLC, Margery S. Bronster, Rex Y. Fujichaku, Bronster Hoshibata, Attorneys At Law, A Law Corporation, Honolulu, HI, for Movants.

Allon Kedem, Clifford M. Sloan, Skadden Arps Slate Meagher & Flom LLP, Washington, DC, Bruce D. Voss, David R. Major, Bays Lung Rose & Holma, Honolulu, HI, for Respondents.

### ORDER STAYING PROCEEDINGS TO ALLOW FOR LIMITED DISCOVERY

ALAN C. KAY, Senior District Judge.

For the following reasons, the Court STAYS proceedings in this action and in the underlying arbitrations, so that the parties may undertake limited discovery as to whether the original parties to the leases either (1) intended to permit consolidation or (2) later amended their agreements to permit consolidation.

### FACTUAL BACKGROUND

Lessees are sixteen small business tenants who have ten years remaining on separate long-term leases for lots in an Oahu industrial estate. (Motion To Com-

pel ("MTC") at 1.) The twenty-four leases (some Lessees rent more than one lot) are between Lessees and three landlords, Masters Properties LLC, Robin 1 Properties LLC, and TSM Properties LLC. (Motion To Dismiss ("MTD") at 8; Reply re MTD at 2.) There are other tenants in the same industrial estate who are not a party to this action; Lessees comprise roughly one-third of the tenants on the estate. (*See* MTC Ex. 39.)

Lessees (or their predecessors-in-interest) entered into the leases with the Damon Estate, the previous owner of the land, between November 1972 and April 1973 (except one lease which was executed in 1994). (MTC at 1.) CommonWealth REIT (then operating under a different name) bought the land from the Damon Estate in 2003. (*Id.*) The interests in the various lots were later transferred to the three current landlords, Masters, Robin, and TSM, which are affiliates of Common-Wealth. (*Id.* at 6.) The three landlord companies have only one "member," SIR REIT, which is a wholly-owned subsidiary of Select Income REIT. (Doc. No. 4 at 4.) Select is a majority-owned subsidiary of CommonWealth. (*Id.* at 3.) For convenience, the Court will refer to Masters, Robin, TSM, CommonWealth, SIR, and Select as, collectively, "Lessors."

The leases in question contain largely identical terms and conditions, including an identical provision regarding the periodic setting of new rents. (*See, e.g.,* MTC Ex. 1 at 12–13.) Rents are to be redetermined every ten years. (*Id.* at 2.) If the parties fail to agree on the new rent, one party will choose one real estate appraiser, and the other party will choose another appraiser. (*Id.* at 12.) Those two appraisers will then together choose a third appraiser, or will ask the state circuit court to choose the third appraiser if they cannot agree. (*Id.* at 12–13.) The three appraisers will determine a "fair and reasonable" annual rent, in a decision which will be "final, conclusive and binding upon the parties." (*Id.* at 13.)

The rent for the final ten-year period, from 2013 to 2022, is now at issue. The parties' negotiations over the new rent have failed. (MTD at 9.) Lessees therefore initiated appraisal proceedings under each individual lease and are now engaged in twenty-four separate proceedings, though appraisals apparently have not yet begun. (*Id.; see* MTC at Ex. 40.) Lessees seek to consolidate all twenty-four appraisals into one proceeding. (MTC at 2.) Lessors want the appraisals to proceed separately. (MTD at 14–15.) Lessees have presented evidence that during the 1980s and 1990s the Damon Estate negotiated rents collectively with a tenants' association, and that in 1992–1993 it engaged in a consolidated arbitration as to the rents for a neighboring industrial estate. (*See* Opp'n to MTD, Decls. & Exs. 3–6.) Lessees assert that the evidence they have presented shows the requisite intent to allow consolidation, but have also requested the opportunity to conduct limited discovery regarding the intent of the original parties to the leases.

### PROCEDURAL HISTORY

Lessees originally filed a motion to consolidate the appraisals in state court. (*See* Doc. No. 1 & Exs.) On November 9, 2012, Lessors timely removed the action to this Court, invoking federal diversity jurisdiction. (Doc. No. 1.)

Lessors filed a Motion To Dismiss the motion to consolidate on December 17, 2012. (Doc. Nos. 25–33.) On December 19, 2012, Magistrate Judge Kurren issued an order noting that Lessees needed to re-file their motion to consolidate before this Court. (Doc. No. 36.) Lessees filed the' instant Motion To Consolidate on December 26, 2012. (Doc. No. 37.) On January

31, 2012, Lessors filed an Opposition to the Motion To Consolidate, and Lessees filed an Opposition to the Motion To Dismiss. (Doc. Nos. 44 & 45.) The parties filed Replies in support of their respective motions on February 28, 2013. (Doc. Nos. 49 & 50.)

After examining the parties' briefs, the Court on April 3, 2013 issued an order requesting supplemental briefing from the parties as to whether the Court has authority to rule on the merits of consolidation, or whether that is a procedural question that the arbitrators must decide. (Doc. No. 52.) The parties filed their supplemental briefs on April 15, 2013. (Doc. Nos. 53 & 54.) A hearing on the parties' motions was held on April 23, 2013.

## DISCUSSION

### I. Motion To Dismiss

Technically, Lessors' Motion To Dismiss the motion to consolidate was procedurally improper. Federal Rule of Civil Procedure ("Rule") 12(b) allows for motions to dismiss to assert defenses "to a claim for relief in any *pleading*." Fed.R.Civ.P. 12(b) (emphasis added). A motion is not a pleading, *Parker v. United States*, 110 F.3d 678, 682 & n. 9 (9th Cir.1997); *see* Fed.R.Civ.P. 7(a), and so a motion to dismiss cannot be filed against a motion. Lessees did not raise this objection, however, and both sides merely used their briefing on the "motion to dismiss" to present further arguments on the merits of the motion to consolidate. The Court will therefore consider the "motion to dismiss" as a cross-motion for an order directing the arbitrations to proceed separately.

### II. Does the FAA Apply to These Agreements?

■ The first question for the Court is whether the Federal Arbitration Act ("FAA") governs this dispute, or whether this dispute is purely a question of state law. *In re Van Dusen*, 654 F.3d 838, 844 (9th Cir.2011) (holding that before contemplating a motion to compel arbitration the district court must determine whether the FAA applies to the agreement at issue).[1] The Court finds that the FAA applies here.

It is true that "[t]he FAA is not the only way into court for parties wanting review of [a dispute concerning arbitration]: they may contemplate enforcement under state statutory or common law, for example...." *Hall St. Assocs.*, 552 U.S. at 590, 128 S.Ct. 1396. "The FAA ... do[es] not extend to all arbitration agreements. As Section 2 makes clear, the Act applies only to contracts 'evidencing a transaction involving commerce,' or arising from a 'maritime transaction.'" *In re Van Dusen*, 654 F.3d at 842–43.

■ Nonetheless, the Supreme Court has held that "[b]ecause the [FAA] provides for 'the enforcement of arbitration agreements within the full reach of the Commerce Clause,' it is perfectly clear that the FAA encompasses a wider range of transactions than those actually ... 'within the flow of interstate commerce.'" *Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56, 123 S.Ct. 2037, 156 L.Ed.2d 46 (2003) (quoting *Perry v. Thomas*, 482 U.S. 483, 490, 107 S.Ct. 2520, 96 L.Ed.2d 426 (1987), and *Allied–Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 273, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995)). Application of the FAA is not defeated because the indi-

---

**1.** It makes no difference that Lessees' Motion was originally filed in state court and does not invoke the FAA. The FAA applies to cases falling within its jurisdiction "whether en-

forcement be sought in state court or federal." *Hall St. Assocs., LLC v. Mattel, Inc.*, 552 U.S. 576, 582, 128 S.Ct. 1396, 170 L.Ed.2d 254 (2008).

vidual transactions did not affect interstate commerce; "Congress's Commerce Clause power 'may be exercised in individual cases without showing any specific effect upon interstate commerce' if in the aggregate the economic activity in question would represent 'a general practice ... subject to federal control.'" *Citizens Bank*, 539 U.S. at 56–57, 123 S.Ct. 2037 (quoting *Mandeville Is. Farms, Inc. v. Am. Crystal Sugar Co.*, 334 U.S. 219, 236, 68 S.Ct. 996, 92 L.Ed. 1328 (1948)).

A handful of courts have found that the FAA did not apply to an arbitration over a real estate transaction. *See SI V, LLC v. FMC Corp.*, 223 F.Supp.2d 1059, 1062 (N.D.Cal.2002) (finding that FAA does not apply in an arbitration dispute over a real estate sale); *Cecala v. Moore*, 982 F.Supp. 609, 612 (N.D.Ill.1997) (finding FAA did not apply in arbitration dispute over representations made in residential real estate sale); *Saneii v. Robards*, 289 F.Supp.2d 855, 859 (W.D.Ky.2003) (finding FAA does not apply to single sale of residential real estate); *see Garrison v. Palmas Del Mar Homeowners Ass'n, Inc.*, 538 F.Supp.2d 468, 475 (D.P.R.2008) (suggesting without deciding that the FAA did not apply to intrastate real estate transactions).

But all the above cases involved onetime real estate sales, not, as here, more than twenty multi-decade leases to commercial businesses. *Cf. Hall Street Assocs.*, 552 U.S. at 590, 128 S.Ct. 1396 (in commercial landlord-tenant dispute, "[t]here was never any question about meeting the FAA § 2 requirement that the leases from which the dispute arose be contracts 'involving commerce'"). Indeed, in a different context the Supreme Court has held that the rental of real property is an activity which "unquestionably" affects interstate commerce: "We need not rely on the connection between the market for residential units and the interstate movement of people to recognize that the local rental of an apartment unit is merely an element of a much broader commercial market in rental properties." *Russell v. United States*, 471 U.S. 858, 860, 105 S.Ct. 2455, 85 L.Ed.2d 829 (1985); *see id.* at 862, 105 S.Ct. 2455 (rental property is property "used ... in an activity affecting interstate ... commerce" under the federal arson statute); *cf. Hackman v. Dickerson Realtors, Inc.*, 520 F.Supp.2d 954, 959 (N.D.Ill.2007) (applying FAA where arbitration provision was contained in the bylaws of a local Illinois realtors' association because even local realty activities affect interstate commerce).

For the foregoing reasons, the Court finds that the FAA applies here, as long as the "appraisal" clauses in question are agreements to "arbitrate" under the meaning of the FAA—a question to which the Court now turns.

### III. Does this Dispute Concern an Arbitration Under the Meaning of the FAA?

■ The parties' leases do not mention "arbitration" or "arbitrators." Instead, they discuss appointing "real estate appraisers" to resolve rent disputes between the parties. The Court must determine whether these clauses can be construed as "arbitration agreements" under the FAA. The Court concludes that they can.

The Ninth Circuit has long held that the definition of "arbitration" when applying the FAA should be provided by the applicable state law, as long as that definition is not inconsistent with federal law. *Wasyl, Inc. v. First Bos. Corp.*, 813 F.2d 1579, 1582 (9th Cir.1987) (applying California arbitration statutes' definition and treating an "appraisal" as an arbitration); *see Portland Gen. Elec. Co. v. U.S. Bank Trust Nat'l Ass'n*, 218 F.3d 1085 (9th Cir.2000) (applying Oregon state law definition and declining to treat an "appraisal" as an

arbitration).[2] Thus, Hawaii state law dictates whether the leases' appraisal provisions should be construed as agreements to arbitrate.

Under Hawaii state law, if an agreement provides that disputes will be submitted to an appraisal panel and that the panel's decision is to be "final, conclusive and binding," the provision should be construed as an agreement to arbitrate. *Loyalty Dev. Co. v. Wholesale Motors, Inc.*, 61 Haw. 483, 605 P.2d 925, 928 (1980). Here, the leases state that the appraisers' decision shall be "final, conclusive, and binding." (MTC Ex. 1 at 13.) The appraisal provisions are therefore agreements to arbitrate under Hawaii law, and under the FAA as applied in this circuit.[3]

### IV. May the Court Decide Consolidation?

■ The Supreme Court has made clear that, unless the arbitration agreement states otherwise, only "gateway" questions, such as whether the parties have agreed to arbitrate at all, are for the courts to decide; "procedural" questions about *how* the arbitration should be conducted are for the arbitrators to decide. *Howsam v.*

*Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84, 123 S.Ct. 588, 154 L.Ed.2d 491 (2002); *see Momot v. Mastro*, 652 F.3d 982, 987 (9th Cir.2011) (discussing *Howsam* and noting that the only issues that "remain within the province of judicial review" are "gateway questions of arbitrability, such as whether the parties have a valid arbitration agreement or are bound by a given arbitration clause, and whether an arbitration clause in a concededly binding contract applies to a given controversy"). Nonetheless, the Court finds that it may decide the consolidation question under the unique circumstances of this case.

Here, the parties apparently agree that they must arbitrate their rent disputes—they merely disagree about whether to proceed in separate arbitrations or in one consolidated arbitration. The Ninth Circuit has not addressed in any published opinion how *Howsam's* reasoning applies to a motion to consolidate arbitrations.[4] But every other circuit court of appeals to address the question has found that, under *Howsam* and its progeny, consolidation should be decided by the arbitrators, not the courts, unless the parties agree otherwise. *See Certain Underwriters at*

**2.** There is a circuit split on this issue. The First, Sixth, and Tenth Circuits apply the federal common law definition of "arbitration," while the Fifth and Ninth Circuits apply state law. *Evanston Ins. Co. v. Cogswell Props., LLC*, 683 F.3d 684, 693 (6th Cir.2012) (collecting cases). The application of state law has been questioned, *see Bakoss v. Certain Underwriters*, 707 F.3d 140, 143–44 (2d Cir. 2013) ("[T]he circuits that apply state law have articulated few reasons for doing so."); *Fit Tech, Inc. v. Bally Total Fitness Holding Corp.*, 374 F.3d 1, 6 (1st Cir.2004) (noting that *Wasyl* "assumed without real analysis that state law governed"), and a subsequent Ninth Circuit panel expressly questioned whether *Wasyl* was correctly decided, *see Portland Gen. Elec.*, 218 F.3d at 1091 (Tashima, J., concurring); *id.* at 1091–92 (McKeown, J., specially concurring). *Wasyl* remains good law, however.

**3.** This analysis would likely be different if this circuit applied the federal common law definition of arbitration. *See, e.g., Salt Lake Tribune Pub. Co. v. Mgmt. Planning, Inc.*, 390 F.3d 684, 689–90 (10th Cir.2004) (finding that an "appraisal" was not an "arbitration" under federal common law).

**4.** The Ninth Circuit has in fact held that under *Howsam*, consolidation should be decided by the arbitrator not the court, but did so in a very short, unpublished memorandum opinion. *See Certain Underwriters at Lloyds v. Cravens Dargan & Co.*, 197 Fed.Appx. 645 (9th Cir.2006). Since the opinion was unpublished and was issued before January 1, 2007, it is not citable as precedent and the Court is not relying on it. *See* U.S.Ct. of App. 9th Cir. Rule 36–3; Fed. R.App. P. 32.1.

Lloyd's London v. Westchester Fire Ins. Co., 489 F.3d 580, 585–87 (3d Cir.2007); Emp'rs Ins. Co. of Wausau v. Century Indem. Co., 443 F.3d 573, 576–78 (7th Cir. 2006); Shaw's Supermarkets, Inc. v. United Food & Commc'l Workers Union, 321 F.3d 251, 254 (1st Cir.2003); see also Davis v. ECPI Coll. of Tech., L.C., 227 Fed.Appx. 250, 253–54 (4th Cir. March 20, 2007) (unpublished) (holding that unconscionability of consolidation waiver was a question for the arbitrator).

The Supreme Court has repeatedly held that a district court's duty under the Federal Arbitration Act is to enforce agreements to arbitrate "according to their terms." AT & T Mobility LLC v. Concepcion, —— U.S. ——, 131 S.Ct. 1740, 1748, 179 L.Ed.2d 742 (2011) (citation omitted); see Samson v. NAMA Holdings, LLC, 637 F.3d 915, 923–24 (9th Cir.2010) (citations omitted). In this case, the arbitration provisions in the leases are fairly simple, and do not say anything at all about consolidation (or about procedures in general, beyond those for selecting the arbitrators).

Nonetheless, it appears that both parties now want the consolidation issue to be decided by this Court, rather than a panel of arbitrators. Both parties argued in their supplemental briefs that the Court should decide the question, and both parties orally stipulated at the hearing on their motions that they agree to have the Court decide it. As Lessors point out, this fact distinguishes the instant case from any of the circuit court of appeals' decisions cited above. (See Resps.' Supp. at 4 & n. 2.) It is clear that parties may agree to a scheme other than the "presumptive" division of labor set out in Howsam. See Howsam, 537 U.S. at 85, 123 S.Ct. 588 (court decides substantive issues and arbitrator decides procedural issues "in the absence of an agreement to the contrary"); Momot, 652 F.3d at 987 (parties agreed to delegate to arbitrator issue presumptively

reserved for the court). The Court therefore finds that, since both parties here have voluntarily submitted the consolidation issue to the Court, the Court may decide the question.

## V. Did the Parties Agree To Consolidation?

The Court must now interpret the substance of the parties' arbitration clause.

The Supreme Court and the Ninth Circuit have repeatedly held that the interpretation of an arbitration agreement is generally a matter of state law. E.g., Stolt–Nielsen S.A. v. AnimalFeeds Int'l Corp., 559 U.S. 662, 130 S.Ct. 1758, 1773, 176 L.Ed.2d 605 (2010) (citing Arthur Andersen LLP v. Carlisle, 556 U.S. 624, 129 S.Ct. 1896, 1901–02, 173 L.Ed.2d 832 (2009); Perry, 482 U.S. at 493, 107 S.Ct. 2520; Cape Flattery Ltd. v. Titan Maritime, LLC, 647 F.3d 914, 920 (9th Cir. 2011) ("The general rule in interpreting arbitration agreements is that courts 'should apply ordinary state-law principles that govern the formation of contracts.'" (quoting First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995))).

Here, however, the Court's required course of action is not so clear. Lessors argue that under Weyerhaeuser Co. v. Western Seas Shipping Co., 743 F.2d 635 (9th Cir.1984), the Court should not look to state-law interpretation rules at all, but should simply deny Lessees' Motion To Consolidate because the written lease agreements—undeniably—do not expressly permit consolidation. (Reply re MTD at 9.) This is a difficult issue, but ultimately the Court disagrees with Lessors.

Weyerhaeuser was decided nearly thirty years ago. In the intervening decades, many Supreme Court and Ninth Circuit decisions have held that a court must apply state-law principles to interpret an arbitration agreement. See, e.g., Mastrobuo-

*no v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 62–64 & n. 9, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995) (applying New York and Illinois law); *Biller v. Toyota Motor Corp.*, 668 F.3d 655, 662 (9th Cir.2012) (applying California law); *Wolsey, Ltd. v. Foodmaker, Inc.*, 144 F.3d 1205, 1210 (9th Cir.1998) (same); *see also Stolt–Nielsen*, 130 S.Ct. at 1768 (explaining that the proper response when presented with an arbitration agreement that is "silent" on an issue is "to identify the rule of law that governs in that situation" under either the FAA or state law).[5]

■ *Weyerhaeuser* did not explicitly hold that a district court should not look to state law to interpret an arbitration agreement—in fact, *Weyerhaeuser* gave no guidance at all as to how a court should determine what the parties agreed to. But to the extent that *Weyerhaeuser* implicitly conflicts with these intervening Supreme Court and Ninth Circuit precedents, the Court finds that it must follow the intervening precedents, which have direct application in this case. The Court will therefore apply state law to interpret the arbitration agreements at issue here.

■ Under Hawaii state law, "it is well settled that courts should not draw inferences from a contract regarding the parties' intent when the contract is definite and unambiguous." *Williams v. Aona*, 121 Hawai'i 1, 210 P.3d 501, 515 (2009). In this case, however, the arbitration provisions are not "definite and unambiguous" as regards consolidation; they say nothing about consolidation at all. In such cases,

Hawaii courts have looked to extrinsic evidence of the parties' intent. *See United Indep. Ins. Agencies, Inc. v. Bank of Honolulu*, 6 Haw.App. 222, 718 P.2d 1097, 1104 (1986) ("Unfortunately the Purchase Agreement is silent concerning the voting rights. Therefore, [the issue] is dependent upon the intent of the parties to be gleaned from other evidence in the record."); *Urban Research Studies & Dev., Ltd. v. Teruya & Sons, Ltd.*, 3 Haw.App. 5, 639 P.2d 1115, 1117 (1982) ("Since the option agreement [is] silent as to the manner and method of exercise of the option, we think the manner and method of exercise must depend on the intention of the parties which is to be gathered from the documents and depositions before the court below.").

■ Lessees argue that, since the question of the parties' underlying intent is at issue, Lessees should be allowed to conduct limited discovery as to the parties' intent. (Opp'n to MTD at 21.) The Court agrees. Discovery may proceed only as to whether the original parties to the leases either (1) intended to permit consolidation or (2) later came to a new agreement to permit consolidation.

## VI. Does Hawai'i's Consolidation Statute Apply?

Finally, Lessees appear to argue that even if the parties did not agree to consolidation, the Court may force consolidation upon the Lessors under Hawaii Revised Statutes § 658A–10. (Opp'n to MTD at 20–21.)[6] The Court disagrees. Chapter

---

**5.** A case that was argued before the Supreme Court last month, *Oxford Health Plans LLC v. Sutter*, may further illuminate what evidence a court may examine, other than the explicit words of the arbitration agreement, to evidence the parties' intent. The Court notes, however, that *Oxford Health*, like *Stolt–Nielsen*, deals with class arbitration, not consolidated arbitration, and involves New Jersey law, not Hawaii law. *See* 675 F.3d 215 (3d Cir.2012). Nonetheless, the Court may consider the *Oxford Health* decision if it is issued soon and provides any guidance.

**6.** Counsel for Lessees appeared to disavow this argument at the hearing on the motions, arguing instead that the state law merely illuminated the parties' intent. The Court nonetheless addresses this issue for the completeness' sake.

658A of the Hawaii Revised Statutes explicitly applies only to arbitration agreements made on or after July 1, 2002. Haw.Rev.Stat. § 658A–3(a). As to arbitration agreements made before July 1, 2002, the chapter governs only "if all the parties to the agreement or to the arbitration so agree in a record." *Id.* § 658A–3(b). Here, the parties clearly have not agreed otherwise. In the absence of such an agreement, the arbitration agreement "shall be governed by the law specified in the agreement to arbitrate or, if none is specified, by the state law in effect on June 30, 2002." *Id.* In this case, the arbitration clause does not specify a law under which to be governed, and the state arbitration act in effect prior to July 1, 2002 did not provide for consolidation. *See* Haw.Rev. Stat. ch. 658 (1993) (repealed 2002).

Moreover, as discussed above, the FAA requires federal courts to enforce arbitration agreements according to their terms. 9 U.S.C. § 4. In order to do so, the Court must inquire as to what terms the parties agreed to. The Court may not, however, order a procedure that the parties did *not* agree to.[7] Such an order would not be consistent with the FAA, which "imposes ... the basic precept that arbitration is a matter of consent, not coercion." *Stolt– Nielsen,* 130 S.Ct. at 1773; *see also id.* at 1776 ("[W]e see the question as being whether the parties *agreed to authorize* class arbitration. Here, where the parties stipulated that there was 'no agreement' on this question, it follows that the parties cannot be compelled to submit their dispute to class arbitration." (emphasis in original)).

## CONCLUSION

For the foregoing reasons, the Court STAYS these proceedings, and those in the underlying arbitrations, so that the parties may undertake limited discovery as to whether the original parties to the leases either (1) intended to permit consolidation or (2) later amended their agreements to permit consolidation. The parties' motions are held in abeyance. Limited discovery shall close on June 3, 2013. No later than June 10, 2013, each side shall file a supplemental brief, complying with the federal and local standards for a summary judgment motion. Each side will then have seven days to file any rebuttal to the other side's supplemental brief.

IT IS SO ORDERED.

## ORDER LIFTING STAY; AMENDING THE COURT'S ORDER OF APRIL 26, 2013; DENYING LESSEES' MOTION TO CONSOLIDATE ARBITRATIONS; GRANTING LESSORS' CROSS–MOTION; AND DISMISSING ACTION

The Court hereby lifts the stay imposed on this action by the Court's Order of April 26, 2013, and for the following reasons AMENDS its Order of April 26, 2013, DENIES Lessees' Motion To Consolidate

---

7. Both parties argue that their chosen procedure is the more practical and efficient. Lessors' position that consolidation would create a "gargantuan" proceeding that would discourage settlements is undercut by their own representation in SEC filings that "[w]e do not believe that the results for determining rent resets will materially differ whether determined pursuant to a single arbitration or instead by separate appraisal proceedings." (Reply re MTC, Ex. 41, at 28.) These arguments are ultimately irrelevant, however, since the Supreme Court has made clear that the Court's duty is to "rigorously enforce agreements to arbitrate, even if the result is 'piecemeal' litigation." *Dean Witter Reynolds Inc. v. Byrd,* 470 U.S. 213, 221, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985); *see id.* at 220, 105 S.Ct. 1238 ("We ... reject the suggestion that the overriding goal of the [FAA] was to promote the expeditious resolution of claims."); *Polimaster Ltd. v. RAE Sys., Inc.,* 623 F.3d 832, 840–41 (9th Cir.2010).

Arbitrations, GRANTS Lessors' Cross–Motion, and DISMISSES this action.

## PROCEDURAL HISTORY

This dispute concerns twenty-four separate arbitrations currently proceeding between sixteen lessees of lots in a Honolulu commercial district ("Lessees") and their current landlords and affiliated companies ("Lessors"). The three current landlords are the successors-in-interest to an original, single landlord.

Lessees originally filed in state court a motion to consolidate their separate arbitrations. (*See* Doc. No. 1 & Exs.) On November 9, 2012, Lessors timely removed the action to this Court, invoking federal diversity jurisdiction. (*Id.*) In December 2012, Lessees re-filed their Motion To Consolidate before this Court (Doc. No. 37 ("MTC")), and Lessors filed a Motion To Dismiss the motion to consolidate (Doc. Nos.25–33). On January 31, 2012, each side filed an opposition to the other's motion. (Doc. Nos. 44 & 45.) The parties filed Replies in support of their respective motions on February 28, 2013. (Doc. Nos. 49 & 50.) The Court held a hearing on the motions on April 23, 2013. (Doc. No. 56.)

After considering the parties' briefs[1] and oral arguments, the Court issued on April 26, 2013 an order staying proceedings in this action for several weeks, so that the parties could undertake limited discovery to determine what the original parties to the leases intended or agreed to regarding consolidation. (Doc. No. 57 ("Stay Order") at 1088–89, 1089–90.)

As required by the Stay Order, on June 10, 2013, each side filed a supplemental brief and Concise Statement of Facts presenting the evidence obtained in discovery.

(Doc. Nos. 84 ("Lessors' Supp."), 85 & 86 ("Lessors' CSF"), 87 ("Lessees' Supp.") & 88 ("Lessees' CSF").) The parties filed responses to one another's supplemental briefs and statements of fact on June 17, 2013. (Doc. Nos. 90 ("Lessors' Resp."), 91 ("Lessors' CSF Obj."), 92 ("Lessees' Resp."), & 93 ("Lessees' CSF Obj.").)

## FACTUAL BACKGROUND

Lessees are sixteen small business tenants who have ten years remaining on twenty-four separate long-term leases for lots in an Oahu commercial district, which will be referred to here as the Lower Mapunapuna Subdivision (*see* Lessors' Supp. at 4 n. 1). Lessees comprise only about one-third of the Lower Mapunapuna tenants. (*See* MTC Ex. 39.)

### I. Leases

Lessees (or their predecessors-in-interest) entered into the leases at issue here with the Damon Estate, the previous owner of the Lower Mapunapuna land, between November 1972 and April 1973, except for one lease which was executed in 1994. (MTC Exs. 1–24 & 40.) The lease agreements were drafted by the Damon Estate's attorneys. (Lessees' CSF ¶ 4.)

In 1972, the Lower Mapunapuna lots were already being leased from the Damon Estate, and the rent on the lots was due to be reset on January 1, 1973. (*See* Lessees' CSF Ex. 1–B, at 1.) Sometime in 1972, "a number of Damon Estate lessees" formed a "committee to negotiate with the estate trustees" regarding the rent reset. (*Id.* at 1–2.) The Damon Estate Trustees discussed the rent readjustment with "representative Mapunapuna lessees" and ulti-

---

**1.** Before hearing arguments on the parties' motions, the Court directed the parties to file briefs addressing whether, under Supreme Court jurisprudence, the Court had the power to decide the consolidation dispute. (Doc.

No. 52.) The parties filed briefs (Doc. Nos. 53 & 54), and the Court ultimately concluded that it had the power to decide the dispute because both sides had agreed to submit the issue to the Court (*see* Doc. No. 57 at 10–12).

mately offered each tenant a choice of either a rent increase for the next ten-year term or a new fifty-year lease. (Lessees' CSF Ex. 1–C.) The Estate's initial offer letter stated that the Estate aimed "to give equal treatment to all Damon Estate lessees." (Lessees' CSF Ex. 1–A, at 2.) [2] The tenants who are party to this action (or their predecessors-in-interest) apparently chose to sign new fifty-year leases. (*See* MTC Exs. 1–24 & 40.) [3]

The initial rents under the new fifty-year leases were apparently set at a uniform rate per square foot. (*See* Lessors' CSF Exs. 1–A & 1–C.) Under a provision identical in all the leases, the rent was to be reset every ten years, in 1983, 1993, 2003, and 2013. (Lessees' CSF ¶ 8.) The reset rent was to be an amount agreed upon by the parties, or if no agreement could be reached, an amount determined by arbitration. (*See, e.g.*, MTC Ex. 1, at 12–13; *see* Lessees' CSF ¶ 7.)

The Damon Estate was the landlord of the Lower Mapunapuna Subdivision until 2003. (Haig Dep. at 103:11–21.) During that period, as described below, the parties never had to resort to arbitration; the Lower Mapunapuna rents were always reset via negotiation. (Lessees' CSF ¶ 10; *see* Lessors' CSF Obj. ¶ 1.)

## II. 1982–83 Rent Reset

In mid–1982, some Lower Mapunapuna tenants formed a tenants' association (the "Association"), with the "primary purpose" of negotiating leases and rents with the Damon Estate. (Lessees' CSF, Declaration of Ross Moody ("Moody Decl.") ¶ 5; Lessees' CSF Exs. 8–10.)

The Association sought to enroll all Lower Mapunapuna tenants. A newsletter dated August 1982 noted that thirty-three of the fifty master lease holders had joined the Association. (Lessees' CSF Ex. 13, at 1.) The newsletter noted "we must do all in our power to operate as a unit, that is, that the Association handle negotiations for everyone." (*Id.*) The tenants who are parties to this action all either were members of the Association or are successors-in-interest to members. (Lessors' Supp. at 9–11.) [4]

Another Association newsletter, dated August 27, 1982, described the Association's first meeting with the Damon Estate Trustees. (Lessees' CSF Ex. 14.) The newsletter states that the Trustees "talked about negotiating on an individual basis" but also said they "would be willing to sit down and negotiate with our group." (*Id.* at 1.) The newsletter concludes by noting that some tenants "feel that their participation with our group is not necessary,"

---

2. David M. Haig, who is the current chair of the Damon Estate Trustees and has served as a Trustee since 1982, testified at deposition that "[a]s a trustee negotiating, ... it was beneficial to us to have everybody on the same piece of paper," and that "[t]he trustees tried very much to provide some uniformity amongst the lease rents." (Lessors' Supp. Ex. G ("Haig Dep."), at 11:8–25, 14:1–4 & 27:7–25.)

3. As noted above, there is one exception-the lease now held by The Solaray Corporation (d.b.a. Lorax, LLC) was executed in 1994. (*See* MTC Ex. 7.) Neither party has explained the circumstances behind this exception and it does not appear to be material.

4. There may, again, be one exception, although neither party fully explains it. Royal Contracting was not a charter member of the Association and does not appear to be a successor-in-interest to a charter member (*see* Lessees' Supp. at 10–11; Lessees' CSF Ex. 6), but, as will be discussed below, was one of a group of tenants who wrote to the Damon Estate in 2002 using Association letterhead (*see* Lessees' CSF Ex. 22, at 2). It appears, however, that the Association had been dissolved in November 1998 (*see* Lessors' Resp., Ex. Z), and it is therefore not clear that Royal was ever a member of the Association.

and urging those tenants to join the Association. (*Id.* at 2.)

On December 21, 1982, the Damon Estate wrote to the Association, "[b]ased on your representation that the [Association] has commitments from the majority of the lessees in the [Lower Mapunapuna Subdivision] to accept the rent . . . as proposed by your Committee, the Trustees . . . approved those proposed rents as follows." (Lessees' CSF Ex. 11, at 1.) The proposed rents were not uniform, instead dividing the Subdivision into three different rent zones, one of which was "to be negotiated on an individual basis." (*Id.*) In January 1983, the Damon Estate wrote to individual tenants offering the rents "recommended by the Association and agreed to by the Trustees." (Lessees' CSF Ex. 12.) The letter asked the tenants to accept their new rent rate by signing and returning a copy of the letter. (*Id.*)

Mr. Haig testified in his deposition that "the trustees found it useful to call upon the leadership of the Tenants Association to help us communicate with our tenants." (Haig Dep. at 20:23–21:9.) He stated "they were perhaps better messengers to try to make . . . the tenants feel more comfortable" and that "we were happy to talk with anybody, you know. . . . [W]e always learned something by talking to our lessees. . . ." (*Id.* at 21:16–19 & 26:2–11.)

### III. 1992–93 Rent Reset

When rents were due to be reset for the second time, the Association once more negotiated with the Damon Estate Trustees. On January 26, 1993, the new president of the Association wrote to its members discussing the rent reset and noting "let me remind you there is strength in numbers." (Lessees' CSF Ex. 3.) On July 16, 1993, the Association wrote to the Damon Estate proposing new rents and stating that the Association "feels confident that the vast majority of lessees represent-

ed by the Association will accept the above rental terms." (Lessees' CSF Ex. 2.)

In 1992–1993, the Damon Estate was also negotiating a rent reset with tenants in another commercial district, which will be referred to here as the Upper Mapunapuna Subdivision (*see* Lessors' Supp. at 4 n. 1). A group of four tenants calling themselves the "Upper Mapunapuna Tenants Group" sent the Damon Estate a rent offer in July 1992. (Lessees' CSF Ex. 15.) The Trustees rejected the offer and initiated arbitration. (*See* Lessees' CSF Ex. 16.) The Trustees agreed to a consolidated arbitration with the tenants in the Upper Mapunapuna Tenants Group and two other Upper Mapunapuna tenants. (*See* Lessees' CSF Ex. 17; Haig Dep. at 35:19–36:21 & 74:20–24; *see also* Haig Dep. at 84:24–25 (stating that the Trustees agreed to consolidate these arbitrations "as a convenience" because they "felt it was in our interest").) Mr. Haig noted in his deposition that the properties at issue in the consolidated proceeding had originally been part of a single lease. (Haig. Dep. at 35:19–36:21.)

Negotiations over the Lower Mapunapuna rents were delayed by the Upper Mapunapuna arbitration. (*See, e.g.,* Lessees' CSF Ex. 3.) The Association's president wrote to its members that if the delay was causing them hardship, "I would suggest that you contact the Trustees to discuss your individual situations." (*Id.*) Ultimately, the Damon Estate Trustees offered the Lower Mapunapuna tenants a rent per square foot that was twenty-five percent less than the rate determined by the arbitration of the Upper Mapunapuna rents. (Lessees' CSF Exs. 3 & 4; Haig Dep. at 77:4–78:11 & 86:21–88:7.) Again, the Estate sent individual letters to each Lower Mapunapuna tenant confirming their individual rent offer and asking each tenant to sign and return their offer letter. (Les-

sees' CSF Ex. 20.) The letter noted that the offer would be withdrawn if not accepted within thirty days. (*Id.* at 2.)

### IV. 2002–03 Rent Reset

In 1997, the Damon Estate offered Lower Mapunapuna tenants in good standing a waiver of owed back-rent and a choice of two plans for future rents covering either the next six or the next sixteen years. (*See* Lessees' CSF Ex. 21; Haig Dep. at 96:7–98:23.) This meant that some Lower Mapunapuna tenants' rents were not reset in 2002–03. On December 6, 2002, however, a group of nine Lower Mapunapuna tenants whose rents apparently were being reset wrote to the Damon Estate on Association stationery,[5] rejecting a recent rent offer from the Estate and stating that "pursuant to Section (B) in our leases" they wished "to collectively pursue arbitration." (Lessees' CSF Ex. 22.) One of those nine tenants, Royal Contracting Co., is a party to this action. (*See id.*)

Counsel for the Damon Estate replied on December 26, 2002. (Lessors' CSF Ex. B.) He pointed out that the Estate had no contractual relationship with the Association and stated that "[d]iscussions with your association to date were only a courtesy to our Lessees listed in your letter." (*Id.* at 1.) He advised the tenants that "the Estate has no intention of entering into a single arbitration as to all of the Lessees indicated in your letter," and that "[t]he Estate will deal with each Lessee per the terms of its respective lease." (*Id.*) He stated that the Estate would contact each of the nine tenants individually to discuss arbitration. (*Id.*) The letter went on to notify these tenants of the Estate's chosen arbitrators; the Estate chose three different arbitrators, who were each to be as-

signed three separate arbitrations. (*Id.* at 2.)

On December 30, 2002, the Estate's counsel wrote to the individual tenants, stating that "*the law does not allow the Association to consolidate* all of the individual arbitrations into a single arbitration" because "the right to arbitration is a contractual arrangement to which only [the tenant] and [the Estate] are parties." (Lessors' CSF Ex. C, at 1 (emphasis in original).) The letter explained the Damon Estate's view of the state law applicable at the time and repeated the Estate's position that "the Lessees do not have the ability to force consolidation of the arbitration proceedings." (*Id.* at 2.) It appears that no arbitration ever proceeded.

The Estate's attorney's letters are consistent with Mr. Haig's deposition testimony. Mr. Haig repeatedly testified that the Damon Estate Trustees understood consolidation to be an option only if both parties agreed to it; "if both parties didn't agree, then it would not be possible to do it." (Haig Dep. at 122:4–7.) He explained that the Trustees "specifically said that if [the tenants] attempted to go to an appraisal as a group, we would resolve that problem by appointing a separate appraiser. . . . [I]f they had attempted to force the issue of a . . . joint appraisal, . . . we would respond by appointing individual appraisers to . . . counter that." (*Id.* at 107:25–108:22.) He agreed with Lessors' counsel's characterization that "regardless of how lease rent negotiations were conducted, the Estate always retained the right to proceed separately with the individual lessee in an appraisal proceeding." (*Id.* at 117:2–8.)

**5.** It appears that the Association had dissolved in November 1998. (*See* Lessors' Resp. Ex. Z.) Moreover, it is not clear whether these nine tenants comprised the entire membership of the Association at the time, if it was still in existence then. (*See, e.g.,* Lessees' CSF Ex. 6.)

Mr. Haig testified that he was "sure" the Trustees had shared the above view with some of the Damon Estate's tenants, though he could not remember a specific occasion when he had done so. (*Id.* at 110:15–111:2.) Mr. Haig testified that he believed it was "always the position of the trustees" that they wanted to "do everything possible" to reach a negotiated rental rate, but "at the same time, wanted to do everything possible to avoid" having "somebody else [i.e., an arbitration panel] reaching a conclusion with a large group of our tenants." (*Id.* at 124:6–15.) He testified that the Estate viewed allowing a single arbitration proceeding over such a large area of property as "bad business judgment." (*Id.* at 110:4–9.)

## V. Negotiations and Consolidated Arbitrations with Lessors

In December 2003, the Damon Estate sold both its Lower Mapunapuna and Upper Mapunapuna properties to Lessor Commonwealth REIT (then known as HRPT Properties Trust). (Haig Dep. at 103:11–21.) Since Lessors took over as landlords, they have engaged in several consolidated rent arbitrations with Upper Mapunapuna tenants, in which separate proceedings concerning different lots leased by a single tenant were consolidated into one arbitration. (*See* Lessees' CSF ¶ 22; Lessors' CSF Obj. ¶ 22; Lessors' CSF Ex. H (Deposition of Jan Yokota) at 70:17–73:25.) There is no evidence, however, that Lessors have ever engaged in a consolidated proceeding with multiple tenants.

As of June 17, 2013, Lessors had reached agreements on rents with fifteen Lower Mapunapuna tenants. (Lessors' Resp., Declaration of Jan Yokota, ¶ 4.) These agreements were reached through separate negotiations with each individual tenant. (*Id.*)

## DISCUSSION

### I. Amendment to the Stay Order

As a preliminary matter, both parties attempt in their supplemental briefs to revisit state-law issues addressed by the Court's Stay Order.

First, Lessors attempt to reargue whether, under Hawaii state law, the Court should look to extrinsic evidence at all. (*See* Lessors' Supp. at 15–20.) Lessors had ample opportunity to present arguments on this issue two months ago in the briefing on the two cross-motions; in fact, Lessors discussed the issue extensively in their Reply in support of their Motion To Dismiss (*see* Doc. No. 49 at 8–13). Lessors did not file a motion for reconsideration, and the time for such a motion has long passed. *See* L.R. 60.1(c). The Court will not allow Lessors to untimely reopen a legal issue that the parties already fully briefed and the Court decided, where Lessors do not allege any intervening change in the law.

■ Second, Lessees assert in a footnote that the Court's reading of Hawaii Revised Statutes chapter 658A as stated in the Court's Stay Order (Doc. No. 57 at 1088–89) is inconsistent with the Hawaii Supreme Court's decision in *AFSCME Local 646 v. Dawson International, Inc.,* 113 Hawai'i 127, 149 P.3d 495, 511–12 (Haw. 2006). (Lessees' Supp. at 27 n. 4.) Lessors had the opportunity to respond to Lessees' footnote (*see* Doc. No. 90), but did not do so. In contrast with the extrinsic evidence issue that Lessors attempted to reopen, the parties had not briefed this aspect of the statute at the time the Stay Order was issued—the Court raised it *sua sponte* at the hearing on the cross-motions. The Court agrees with Lessees' (unopposed) reading of the applicable state law, and hereby amends the Stay Order as follows. On pages 1088–89, the text of section VI is

deleted in its entirety and replaced with the following:

> Finally, Lessees appear to argue that even if the parties did not agree to consolidation, the Court may force consolidation upon the Lessors under Hawaii Revised Statutes § 658A–10. (Opp'n to MTD at 20–21.)[6] The Court disagrees. As discussed above, the FAA requires federal courts to enforce arbitration agreements according to their terms. 9 U.S.C. § 4. In order to do so, the Court must inquire as to what terms the parties agreed to. The Court may not, however, order a procedure that the parties did *not* agree to. Such an order would not be consistent with the FAA, which "imposes ... the basic precept that arbitration is a matter of consent, not coercion." *Stolt–Nielsen,* 130 S.Ct. at 1773.

> The "overriding goal" of the FAA, even above promoting the expeditious resolution of claims, is "to ensure judicial enforcement of privately made agreements to arbitrate." *Dean Witter,* 470 U.S. at 219[, 105 S.Ct. 1238]. Thus, in *AT & T Mobility,* the Supreme Court held that a California state-court rule which refused to enforce class-action waivers in arbitration agreements was preempted by the FAA. — U.S. —, 131 S.Ct. 1740, 179 L.Ed.2d 742. The Supreme Court repeated that the "principal purpose" of the FAA is to "ensure that private arbitration agreements are enforced according to their terms." *Id.* at 1748 (quoting *Volt,* 489 U.S. at 478[, 109 S.Ct. 1248].) It held that section 4 of the FAA "requires courts to compel arbitration 'in accordance with the terms of the agreement,'" and noted that the Court had already held that "parties

may agree ... to arbitrate according to specific rules, and to limit *with whom* a party will arbitrate its disputes." *Id.* at 1748–49 (citations omitted; emphasis in original).

> The Court went on to hold: "Arbitration is a matter of contract, and *the FAA requires courts to honor parties' expectations.* ... States cannot require a procedure that is inconsistent with the FAA, even if it is desirable for unrelated reasons." *Id.* at 1752–53 (emphasis added; citation omitted); *see Dean Witter,* 470 U.S. at 220–21[, 105 S.Ct. 1238] ("The preeminent concern of Congress in passing the [FAA] was to enforce private agreements into which parties had entered, and that concern requires that we rigorously enforce agreements to arbitrate, even if the result is 'piecemeal' litigation....") The Supreme Court's reasoning in *AT & T* and *Dean Witter* is directly applicable here. This Court may not apply a state statute to force the parties into an arbitration procedure that the parties did not agree to, even if the state—or this Court—believes that the procedure would be more efficient.

This amendment does not change the outcome of the Stay Order.

The Court now turns to the evidence presented by the parties in their supplemental briefing.

## II. Evidence as to Parties' Intent & Practice

As discussed more fully in the Court's Stay Order, the Federal Arbitration Act ("FAA") "imposes ... the basic precept that arbitration is a matter of consent, not coercion." *Stolt–Nielsen S.A. v. Animal-Feeds Int'l Corp.,* 559 U.S. 662, 130 S.Ct.

---

6. Counsel for Lessees appeared to disavow this argument at the hearing on the motions, arguing instead that the state law merely illu- minated the parties' intent. The Court nonetheless addresses this issue for completeness' sake.

1758, 1773, 176 L.Ed.2d 605 (2010); *see also id.* at 1776 ("[W]e see the question as being whether the parties *agreed to authorize* class arbitration."). The Court's duty under the FAA is to "give effect to the contractual rights and expectations of the parties," and in that endeavor, "the parties' intentions control." *Id.* at 1774. The question addressed by the parties' limited discovery and supplemental briefing was what, exactly, the parties to the leases intended or agreed to.[7]

■ The parties do not dispute that, even though the Damon Estate routinely negotiated rents with the Association, the Damon Estate never participated in a consolidated arbitration involving Lower Mapunapuna tenants. (*See* Lessees' CSF ¶ 17.) Lessees argue that the Damon Estate nonetheless implicitly committed to holding consolidated arbitrations with its Lower Mapunapuna tenants if arbitration became necessary. For the following reasons, the Court finds Lessees' arguments unconvincing.

### A. Uniform Rents

Lessees emphasize that the initial rents were set in 1972–73 at a uniform rate per square foot and that Mr. Haig testified that the Trustees "tried very much to provide some uniformity amongst the lease rents." (*See* Lessees' Supp. at 7–8.) There is no evidence, however, that either side believed the rent per square foot was *required* to be uniform. Indeed, it is undisputed that the rent did not remain uniform in later years. (*See id.* at 8.) The fact that the Trustees preferred to keep the Lower Mapunapuna rents similar does not demonstrate that the rents were required to be identical or were considered

to be unitary. Moreover, although the Damon Estate apparently offered its 1972–1973 rent rates after discussions with "representative Mapunapuna lessees" (*see* Lessees' CSF Ex. 1–C), Lessees have presented no evidence that this tenants' committee (*see* Lessees' CSF Ex. 1–B) was anything more than a voluntary, non-binding discussion group. The Association did not exist when the leases were executed; it was formed in 1982, in anticipation of the first rent reset. (Moody Decl. ¶ 5.) Indeed, as discussed below, the Association also appears to have been a voluntary, non-binding group, that did not necessarily even include all of the Lower Mapunapuna tenants.

### B. Group Negotiations

■ Lessees argue that because the Damon Estate participated in group negotiations, the Estate was somehow required to submit to consolidated arbitration, if arbitration became necessary. Lessees repeatedly assert that negotiation and arbitration were "one continuous" "intertwined, integrated," "singular" process. (Lessees' Supp. at 3, 4.) Lessees have failed to present a convincing rationale for why it should be so, however. While the leases discuss arbitration procedures, they say nothing at all about negotiation. (*See, e.g.,* MTC Ex. 1, at 12–13.) Moreover, the contemporaneous documentary evidence shows that during each rent reset period, both sides regarded the group negotiations via the Association as voluntary, and believed that individual negotiations could occur at any time.

First, the evidence demonstrates that all Lower Mapunapuna tenants were not re-

---

7. In the Stay Order, the Court noted that the Supreme Court's decision in *Oxford Health Plans v. Sutter,* was pending and might illuminate what evidence a court may examine to determine the parties' intent. (Stay Order at 1081 n. 5.) That *opinion* has now been published, *see* —— U.S. ——, 133 S.Ct. 2064, 186 L.Ed.2d 113 (2013), but is not helpful here given the specific facts and procedural posture of this case.

quired to join the Association, and that some did not join. (*See* Lessees' CSF Ex. 13, at 1 (thirty-three of fifty leaseholders joined).) Indeed, the leaders of the Association repeatedly urged tenants to join the group and to remain with the group. (*See, e.g.,* Lessees' CSF Ex. 3, at 1 ("Please let me remind you there is strength in numbers ..."); Lessees' CSF Ex. 10 ("We urge you to attend.").) The Association explained in its August 1982 newsletter:

> Follow-up work is being carried out to insure that we secure 100% participation. That's our objective.... [W]e must do all in our power to operate as a unit, that is, that the Association handle negotiations for everyone. This will improve everyone's chances for a more favorable rent....

(Lessees' CSF Ex. 13, at 1.)

Second, the evidence demonstrates that the Association believed that the Trustees' dealing with the Association was entirely voluntary, both initially and during the later rent resets. During the Association's very first meeting with the Damon Estate Trustees, the two sides discussed the possibility of "negotiating on an individual basis, programming the rent increases to meet various conditions that individuals might find more suitable to their acceptance." (Lessees' CSF Ex. 14, at 1.) The Association's account of the meeting then notes that the Trustees "said that [they] *would be willing* to sit down and negotiate with our group." (*Id.* (emphasis added).) There is no suggestion that the Trustees were required to negotiate with the Association, or could not negotiate separately with individual tenants. In 1993, noting that the Lower Mapunapuna rent negotiations were being delayed by the Upper Mapunapuna arbitration, the Association's president wrote to its members that if any of them would suffer hardship from the delay, "I would suggest that you contact the Trustees to discuss your individual sit-

uation." (Lessees' CSF Ex. 3.) And in 1997, the Damon Estate offered waivers of owed back-rent and a choice of future payment plans individually to each tenant. (*See* Lessees' CSF Es. 21; Haig Dep. at 96:7–98.23.)

Third, the conduct of the negotiations demonstrates that the Association could not bind its members. The Association's proposal letters note that "the Association feels confident that the vast majority of lessees represented by the Association will accept the above [proposed] rental terms." (Lessees' CSF Ex. 2.) The Damon Estate considered the Association's proposals on the understanding that the Association's members had individually agreed to the proposal. (*See, e.g.,* Lessees' CSF Ex. 11, at 1 (approving proposed rents "[b]ased on your representation that the [Association] has commitments from the majority of the lessees ... to accept the rent....").) Then, once the Estate and the Association had settled on a proposed rent, the Estate sent individual, revocable letters to each tenant offering that rent. For instance, in a letter from the Estate to the Association dated December 21, 1982, the Estate says:

> We understand you will furnish us a list of your members who have agreed to these rents whereupon we will furnish you with a letter agreement for submission to and execution by such members establishing the rent for the ensuing 10 year period. Those choosing not to sign up as indicated above will be contacted in due course by the Estate to seek agreement or proceed to arbitration.

(Lessees' CSF Ex. 11, at 1.) The individual members could accept or reject the offer sent to them. (*See, e.g.,* Lessors' CSF Ex. 12 (1983 letter); Lessors' CSF Ex. 20, at 2 (1993 letter, noting that offer would be withdrawn if not accepted within thirty days).) The correspondence thus demonstrates that at every stage of the negotia-

tion, each tenant was individually free to accept or reject the proposed rent and was never bound by the Association.[8]

In sum, the Estate's negotiations with the Association do not demonstrate an agreement to treat all Lower Mapunapuna tenants as a unified bloc, or even an agreement to treat only the Association's *members* as a unified bloc. Nor do they demonstrate a custom, practice, or course of conduct of so doing. All the contemporaneous documentary evidence is consistent with Mr. Haig's testimony that the Damon Estate Trustees voluntarily worked with the Association because they "found it useful ... to help us communicate with our tenants." (Haig Dep. at 21:6–9.)

### C. 2002–2003 Rent Reset

Lessees' theory of an "integrated" negotiation-and-arbitration process is also seriously put in doubt by the events surrounding the 2002–03 rent reset.

First, tenants in good standing had apparently been given offers in 1997 to freeze or write off some of their rent for either six or sixteen years. (*See* Lessees' CSF Ex. 21; Haig Dep. at 96:4–98:23.) Mr. Haig's deposition testimony and the text of the letter itself make clear that not all tenants were given this offer. (Haig Dep. at 96:4–98:23; Lessees' CSF Ex. 21.) Each eligible tenant was given two payment plan options to select from (*see* Lessees' CSF Ex. 21), and Lessees have presented no evidence of any group negotiation of this offer or group discussion of its acceptance. In other words, there is no evidence that the tenants acted as a unitary group with regard to this offer.

Second, the group of nine tenants that in 2002 requested a consolidated rent arbitra-

tion included only one of the parties to the present action, Royal Contracting. (*See* Lessees' CSF Ex. 22.) In other words, the other fifteen Lessees did not act with Royal in 2002. Again, this fact contradicts Lessees' theory that rent could be negotiated and arbitrated only with all the tenants, or that the Lower Mapunapuna tenants, or even just the Lessees, believed themselves to be a unitary group.

Third and finally, the Damon Estate's responses to the 2002 request for consolidated arbitration made crystal clear the Estate's position on consolidation, *i.e.*, that negotiations with the Association group had been a courtesy to the tenants and that the tenants could not force consolidation upon the Estate. (*See* Lessors' CSF Exs. B & C.)

The Damon Estate's 2002 letters are damning for Lessees' case. Lessees therefore argue that these letters "sought unilaterally to amend the parties' mutually-established method of carrying out the rent reset process." (Lessees' Supp. at 29.) The Court disagrees. For all the reasons discussed above, the evidence presented does not show or even imply that either side believed during the 1982–83 and 1992–93 rent resets that group action was required or could be forced upon an unwilling party.

### D. Discussions of Arbitration During Negotiations

It is clear that the Damon Estate and its tenants always discussed arbitration during their rent negotiations. For example, notes dated April 19, 1993 from a meeting between the Trustees and Association leadership state: "DAMON WISHES TO AVOID FUTURE ARBITRATIONS. A.

---

**8.** For this reason, Lessees' claim that the Trustees "explicitly recognized that the Association acted as the lessees' representative to set the lease rent" (Lessees' Supp. at 3 & CSF ¶ 12) overreaches. Neither side believed or behaved as though the Association was its members' legal representative.

GOOD WILL CONSEQUENCES. B. COSTLY." (Lesses' CSF Ex. 5, at 1.) Mr. Haig testified that arbitration was always discussed during negotiations, and that the Trustees always communicated that they wished to avoid arbitration if possible. (Haig Dep. at 15:21–16:4.)

The two sides disagree as to whether individual arbitrations were ever discussed. Mr. Haig testified that he was "sure" the Trustees had shared with tenants their view that the Estate had the right to insist on individual arbitrations, though he could not recall a specific instance when they had done so. (*Id.* at 110:19–111:2.) Mr. Moody, on the other hand, asserts that the Estate never raised the threat of separate arbitrations. (Moody Decl. ¶ 21.)

Lessees' arguments on this point are inconsistent, however. On the one hand, Lessees argue that the Damon Estate could not have required individual arbitrations, given the parties' history of group negotiations. On the other hand, Lessees repeatedly claim, based on Mr. Haig's deposition testimony, that the Damon Estate Trustees "bullied" their tenants with the threat of arbitration. (*See, e.g.,* Lessees' CSF ¶ 9; Lessees' Resp. at 6–7 & n. 2.) When Mr. Haig used the term "bullying," however, he was referring to using the threat of *individual* arbitrations. (*See* Haig Dep. at 109:5–17 (testifying in response to the question "What would be the purpose of appointing separate … appraisers for each lot?"); *id.* at 109:18–21 (next question: "So the purpose of appointing separate appraisers for separate lots, even if it was the same tenant, would be to put some pressure on [the tenants], to bully them, as you say?").) [9] Lessees' claim that "[h]ad the Damon Estate's 'bullying' not succeeded, consolidated arbitra-

tion was the next step" (Lessees' Supp. at 4) is therefore particularly unconvincing.

### E. Consolidation As An Option

 Both sides have presented copious evidence that both the Lower Mapunapuna tenants and the Damon Estate believed that group negotiations and consolidated arbitrations were available *options* if all parties agreed to them. The Court therefore disagrees with Lessors' assertion that "the Damon Estate always understood the 'Appraisal' provision as authorizing bilateral arbitration only" (Lessors' Supp. at 8). The evidence indicates that the Trustees believed arbitrations could be consolidated if all parties agreed to it. Indeed, Mr. Haig testified that if it had come to arbitration, the Trustees "might not [have gone] for an individual appraisal for each lot," but, "at the very least … would certainly [have tried] to break it up into a number of appraisal processes." (Haig Dep. at 110:6–9.) Moreover, the Damon Estate agreed to a consolidated arbitration with a group of tenants in the Upper Mapunapuna Subdivision where the lots at issue had originally been leased as a single property. (Haig Dep. at 35:19–36:21, 74:20–24, & 84:24–25.)

Thus, the Court does not disagree with Lessees' characterization that "the original parties to the subject leases intended to *allow for* the consolidation of arbitration proceedings." (Lessees' Supp. at 26 (emphasis added).) As Lessors correctly note, nothing in the leases *prohibits* the parties from agreeing to consolidated proceedings. (Lessors' Resp. at 16.) The parties' discovery and supplemental briefing has raised a more granular question about the parties' intent under the leases, however—namely, *under what conditions* the parties

---

9. The Court notes that Mr. Haig explicitly corrected his use of the verb "bully" later in the deposition, stating that it mischaracter-

ized the Trustees' intentions. (Haig Dep. at 124:6–7.)

intended that arbitrations could be consolidated. Lessees have presented no evidence that either side intended or expected that consolidation could be forced upon an unwilling party. Rather, the evidence demonstrates that the Lower Mapunapuna tenants did not always act as a group, but only did so when they felt it was in their best interests, and even then did not necessarily include every Lower Mapunapuna tenant. Similarly, the evidence shows that the Damon Estate did not expect or intend for consolidation to occur unless all parties consented to it.

The Court's duty under the FAA is to give effect to the parties' contractual rights and expectations. *Stolt–Nielsen,* 130 S.Ct. at 1774. In so doing, the parties' intentions control. *Id.* Here, the Court finds that the parties to the leases intended consolidated proceedings to be an option only if all parties agreed to consolidate. Since Lessors emphatically do not agree to consolidate these arbitrations, the Court must deny Lessees' motion to consolidate.

### *CONCLUSION*

The Court hereby LIFTS the temporary stay in this action and, for the foregoing reasons: (1) AMENDS its Order of April 26, 2013 (Doc. No. 57) as described above; (2) DENIES Lessees' Motion To Consolidate Arbitrations (Doc. No. 37); and (3) GRANTS Lessors' Cross–Motion (Doc. No. 25). This action is DISMISSED so that separate arbitrations may proceed in accordance with the terms of the leases.

IT IS SO ORDERED.